ZEIGLER COAL COMPANY, Petitioner,

v.

**Thomas S. KLEPPE, Secretary, Department of the Interior, Respondent,**

**United Mines Workers of America, Intervenor.**

**No. 75-1139.**

United States Court of Appeals, District of Columbia Circuit.

Argued 19 Feb. 1976.

Decided 22 April 1976.

---

J. Halbert Woods, Chicago, Ill., for petitioner.

Allen H. Sachsel, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, for respondent. Rex E. Lee, Asst. Atty. Gen. and Ronald R. Glancz, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., were on the brief for respondent. Stephen F. Eilperin, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent.

Steven B. Jacobson, Washington, D. C., with whom Joseph A. Yablonski, was on the brief for intervenor.

Guy Farmer and William A. Gershuny, Washington, D. C., filed a brief on behalf of Bituminous Coal Operators' Ass'n, as amicus curiae, urging reversal.

Before BAZELON, Chief Judge, WILKEY, Circuit Judge and MERHIGE,* United States District Judge for the Eastern District of Virginia.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Petitioner is the operator of the Zeigler No. 9 Mine near Madisonville, Kentucky. The purely legal issues swirl about the enforceability of the mine's ventilation plan, which was adopted by the operator after approval and subject to periodic review by the respondent Secretary pursuant to the Federal Coal Mine Health and Safety Act.[1] This appeal of a mine inspector's withdrawal order,[2] which had the effect of

---

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. 30 U.S.C. § 801–960 (1970). This court has recently decided a case concerning different sections of this statute, in which the present parties were involved. *United Mine Workers v. Kleppe,* 174 U.S.App.D.C. ——, 532 F.2d 1403 (1976).

2. Withdrawal is the removal of all operating personnel from the mine. The civil and criminal penalties of § 109, 30 U.S.C. § 819 (1970) and the withdrawal power granted under § 104,

closing the mine for a short period, presents a difficult and novel question of statutory construction. The language of § 104(b)[3] and other enforcement provisions limits their application to violations of "any mandatory health or safety standard."[4] The principal question thus becomes whether the notice and withdrawal provisions of § 104(b) may be invoked in response to violations of a ventilation system and methane and dust control plan, adopted by the operator pursuant to § 303(o).[5]

## I.

Setting the stage for controversy, petitioner's ventilation plan was apparently amended at the agency's suggestion on 9 November 1973. A requirement was added, to be effective 1 January 1974, that "wood used in stoppings, doors, and other ventilation controls" be treated with fire-retardant material.[6]

On 25 January 1974 a Mine Enforcement Safety Administration (MESA) inspector is-sued a notice of violation pursuant to § 104(b), charging that three doors in the mine had not been so treated. Six days were given to abate the condition, although the total time required, once fire-retardant paint was procured, was only about four man-hours per door. On 31 January the condition had not been completely abated, and an additional day was given to comply. Again on the morning of 1 February a further extension was given until 1:45 p. m. When full compliance had not been achieved by that time, the inspector issued the order of withdrawal here under attack. Compliance was achieved and the mine was reopened at 5:45 p. m. the same day.[7]

Petitioner sought review of the inspector's withdrawal order, pursuant to § 105(a) of the Act.[8] After a hearing on the merits, the Administrative Law Judge upheld the inspector's withdrawal order, rejecting Petitioner's contention that there had been no violation of a mandatory standard as required to trigger the § 104(b) provisions.[9] This is the basic legal issue in the case. On

30 U.S.C. § 814 (1970), are the two coercive means granted under the statute to compel compliance with the terms of the Act.

3. 30 U.S.C. § 814(b) (1970).
   Section 104(b) allows the Secretary to order withdrawal after notice and reasonable opportunity for abatement, where "there has been a violation of any mandatory health or safety standard" which poses no imminent danger to health or safety. It operates in conjunction with two other provisions of § 104. Section 104(a) authorizes immediate withdrawal without opportunity for abatement, wherever imminent danger exists. Section 104(c) authorizes withdrawal in the face of "unwarrantable failure . . . to comply with" a mandatory health or safety standard, which "could significantly and substantially contribute to the cause and effect of a mine safety or health hazard . . . ," where notice of a violation similarly describable has been given within the past ninety days.

4. Only § 104(a) and the willful violation provisions of §§ 109(b) and (c), 30 U.S.C. §§ 814(a), 819(b) and (c) (1970), among the enforcement provisions of the Act, are not strictly limited by their language to mandatory standard violations. Even these sections seem to require as their predicate an initial finding of imminent danger under § 104(a), in order to be applicable in the absence of a mandatory standard violation. Thus they do not provide a generally available avenue of enforcement for any promulgations under the Act not properly classified as mandatory standards.

5. 30 U.S.C. § 863(o) (1970).
   A ventilation system and methane and dust control plan and revisions thereof suitable to the conditions and the mining system of the coal mine and approved by the Secretary shall be adopted by the operator and set out in printed form within ninety days after the operative date of this subchapter. The plan shall show the type and location of mechanical ventilation equipment installed and operated in the mine, such additional or improved equipment as the Secretary may require, the quantity and velocity of air reaching each working face, and such other information as the Secretary may require. Such plan shall be reviewed by the operator and the Secretary at least every six months.

6. Opinion of Administrative Law Judge, 82 I.D. 38, 46 (1974); *App.* at 64.

7. Opinion of Administrative Law Judge, 82 I.D. 38, 49–50 (1974).

8. 30 U.S.C. § 815(a) (1970).

9. Opinion of Administrative Law Judge, 82 I.D. 38, 51 (1974).

appeal to the full Interior Board of Mine Operations Appeals, this decision was affirmed.[10]

On this appeal of the Board's order of affirmance, the material facts are not in dispute. Rather, the question posed is one of law, which has far-reaching importance for the future effectiveness of the statute. For, while numerous standards, regulations, and plans [11] have been promulgated in implementation of the Act, the enforcement provisions are, in general, made applicable only to violations of so-called "mandatory standards." Our construction of this mandatory standard concept, in resolving the case before us, will necessarily reflect upon the enforceability of numerous regulations and plans. We therefore deem it prudent to begin our discussion of the law governing this case with a brief overview of the operative provisions of the statute.

## II.

The Federal Coal Mine Health and Safety Act of 1969 was enacted in the wake of the 1968 Farmington, West Virginia, mine disaster, in order "to protect the health and safety of coal miners, and to combat the steady toll of life, limb, and lung, which terrorizes so many unfortunate families." [12] In pursuit of this objective, Congress moved simultaneously in two directions. It established a comprehensive set of standards, an elaborate procedure for their modification, and provisions for their enforcement, in order to assure health and safety conditions commensurate with the expanding horizons of knowledge and technology. And it also established a program of relief for victims of black lung disease and their families. It is the former set of provisions that are involved in the action before us. The standards, and their means of enforcement, were the product of a hard-fought legislative battle, whence arises most of our judicial difficulties, as we conscientiously attempt to ascertain and faithfully carry out the intent of Congress.

The part of the Act aimed at assuring the maintenance within mines of appropriate health and safety conditions, is built around the concept of the mandatory standard. The legislative history reveals two competing concerns in the minds of persons affected by the legislation, and the mandatory standard concept was adopted as a way of reconciling the apparent inconsistency. On the one hand, Congress' inability to respond rapidly to changing conditions of knowledge and technology made it desirable to create a power of amendment at the agency level.[13] On the other hand, strong fears were voiced by representatives of *both* industry and labor that a freely exercised power of amendment might result in an unpredictable and capricious administration of the statute, which would redound to the benefit of no one.[14]

The mandatory standard concept evolved to deal with this dilemma combines a comprehensive set of "interim" mandatory standards, promulgated by Congress,[15] with elaborate consultative procedures for the formulation of additional "improved" mandatory standards. These § 101

---

**10.** 4 I.B.M.A. 30, 82 I.D. 36 (1975); Denial of Petition for Reconsideration, *App.* at 101–02.

**11.** Along with the ventilation plan which is the subject of this suit, each operator is required to adopt a roof control plan, § 302(a), 30 U.S.C. § 862(a) (1970), and various types of emergency plans. *See, e. g.,* §§ 303(t), 315, 317(m), 30 U.S.C. §§ 863(t), 875, 877(m) (1970).

**12.** H.Rep.No.91–563, 91st Cong., 1st Sess. (1969), U.S.Code Cong. & Admin.News 1969, p. 2503. *See United Mine Workers v. Kleppe,* 174 U.S.App.D.C. ——, ——, 532 F.2d 1403, 1405–06; 30 U.S.C. § 801 (1970) (declaration of purpose), note 44 *infra.*

**13.** Testimony arguing for an agency power of amendment can be found throughout the hearings before both Houses of Congress. Some of those statements are excerpted in the appendix. *App.* at 103–07, 111, 115–16.

**14.** This concern was expressed primarily by certain representatives of mine workers and operators. *App.* at 108–10, 113–115, 116–120.

**15.** §§ 202–06, 302–18, 30 U.S.C. §§ 842–46, 862–78 (1970).

procedures,[16] which may never be used to decrease the level of protection afforded miners under an existing standard,[17] prescribe the precise manner in which the Secretary[18] is to promulgate new mandatory standards. The most important aspect is the requirement of consultation with knowledgeable representatives of federal and state government, industry and labor.[19] This goes far beyond the usual requirements of public notice and opportunity for comment set forth in the Administrative Procedure Act, and represents the Congressional answer to the fears expressed by industry and labor of the prospect of unchecked federal administrative discretion in the field. These rather unique requirements of the Act are an important part of the ultimate legislative compromise, and must be given their due weight.

In addition to these interim and improved mandatory standards, the Act also provides for several types of promulgations that are not bound by the procedures of § 101. A substantial number of the interim standards impose requirements whose actual terms are to be set in part by action of the Secretary.[20] The statute makes clear that in setting these terms, it is the Administrative Procedure Act rather than the more stringent provisions of § 101 which governs.[21] In the case of many other interim standards, regulations have been adopted, again without resort to the § 101 procedures, which make more specific and definite requirements enunciated in the standard itself.[22] Precise definition of terms

used is a common type of such regulation. Finally, various requirements pertaining to each mine have been promulgated pursuant to specific mandatory standards which require the operator to adopt plans of various types.[23] These plans appear to be developed by informal negotiations between the operator and the Secretary's representative, without any pretense of compliance with § 101.

The final important element of the statutory scheme is the enforcement machinery by which the mine operators are compelled to obey the health and safety requirements otherwise promulgated. The statute establishes three kinds of enforcement remedies —withdrawal, civil fine, and criminal penalties—and sets up procedures governing the application of each. It provides for remedial actions of increasing severity, as the nature of the conduct being redressed grows more serious. But except insofar as § 104(a) allows for immediate withdrawal in any instance of imminent danger, virtually all [24] of the enforcement provisions of the Act require violation of a mandatory health or safety standard to bring them into play. Section 3(1) of the Act tells us that mandatory standard "means" the interim standards set out in the Act, and any improved standards promulgated under the § 101 procedures.[25] The problem before us is to determine whether this definition, which seems to exclude all requirements neither contained in the original statute nor promulgated under § 101, renders unenforcea-

**16.** 30 U.S.C. § 811 (1970).

**17.** § 101(b), 30 U.S.C. § 811(b) (1970).

**18.** Safety standards are to be promulgated by the Secretary of Interior, while health standards are left to the Secretary of Health, Education, and Welfare. 30 U.S.C. §§ 811(c) and (d) (1970).

**19.** *Id.* The mandatory standards enacted under § 101 are codified at 30 C.F.R. §§ 77.1–77.1916 (1975).

**20.** *See, e. g.,* §§ 303(a), (b), (d), (e)–(j), (*l*)–(n), (s), (w)–(z), 30 U.S.C. § 863 (1970).

**21.** § 301(d), 30 U.S.C. § 861(d) (1970).

**22.** All of the regulations adopted under the § 301(d) authorization, without invocation of the § 101 procedures, are contained in 30 C.F.R. §§ 75.1–75.1808 (1975).

**23.** *See* note 11 *supra.*

**24.** Sections 109(b) and (c), 30 U.S.C. § 819(b) and (c) (1970) allow for civil and criminal penalties in cases of willful violations of orders issued under the Act. But the applicability of these provisions is inherently limited. *See* note 4 *supra.*

**25.** § 3(*l*), 30 U.S.C. § 802(*l*) (1970).

ble the term of the ventilation plan which is at issue here.[26]

III.

Our first inclination is to construe literal-

## FEDERAL COAL MINE HEALTH AND SAFETY ACT

| | MANDATORY STANDARDS | | PROMULGATIONS UNDER ACT OTHER THAN MANDATORY STANDARDS | | |
|---|---|---|---|---|---|
| | Interim | Improved | Regulations "deem[ed] appropriate to carry out any provision of this chapter." | Actions to be carried out under §§ 302-18," as prescribed by the Secretary [of Interior." | Specific provisions of a ventilation plan. |
| **Description:** | Interim | Improved | | | |
| **Authorization:** | Enacted by Statute, §§ 202-06, 302-18, 30 U.S.C §§ 842-46, 862-78 (1970). | § 101, 30 U.S.C. § 811 (1970). | § 508, 30 U.S.C. § 957 (1970). | §§ 301(d), 302-18, 30 U.S.C. §§ 861(d), 862-78 (1970). | § 303(o) 30 U.S.C. § 863(o) (1970). |
| **Promulgating Authority:** | CONGRESS | Sec. of Int. re: Safety Sec. of HEW re: Health | Sec. of Int. (through Bureau of Mines) | Sec. of Int. (through Bureau of Mines) | Adopted by operator (with approval of representative designated by Sec. of Int.) |
| **Procedure:** | | § 101 (Elaborate consultation) | APA Rulemaking | APA Rulemaking | APA Rulemaking? (not necessary to decide in this case. See note 57 infra) |
| **Penalties:** | Notice of violation and possible withdrawal under § 104, 30 U.S.C. § 814 (1970). Civil or Crim. Penalty under § 109, 30 U.S.C. § 819 (1970). | SAME | SAME (if enforceable) | SAME (if enforceable) | (Central Issue of this case) |
| **Enforcer:** | Sec. of Int. through MESA Inspector | SAME | SAME (if enforceable) | SAME (if enforceable) | SAME (if enforceable) |
| **Procedure:** | Decision of Inspector subject to post hoc review of ALJ, IBMA, and Courts | SAME | SAME (if enforceable) | SAME (if enforceable) | SAME (if enforceable) |

*(Left margin vertical labels: PROMULGATION; ENFORCEMENT)*

26. For purposes of clarity, it may be useful to summarize the complex provisions of the Act in chart form. See p. ——, 536 F.2d at p. 404.

ly the language of § 3(*l*), which defines the mandatory standards as the interim standards set out in the Act and any improved standards promulgated under the § 101 procedures. Since the terms of actual ventilation plans seem to fit within neither category,[27] such a view would lead us to conclude that no mandatory standard has been violated, and thus that the inspector's enforcement action pursuant to § 104(b) was improper.

While such a conclusion would spare us the burden of a more complex analysis of the statute, there are compelling reasons for rejecting it as a deceptively simple resolution of the problem. Most importantly, this "plain-meaning" approach to the statute would render unenforceable not only the terms of ventilation and other plans adopted by operators pursuant to interim standards—but it would also prevent enforcement of the regulations promulgated to complete, flesh out, and elaborate upon many interim mandatory standards. Many of the standards adopted by Congress provide for certain actions to be carried out in a manner prescribed by the Secretary,[28] and the statute makes clear that the Secretary's determination of such matters is governed by the Administrative Procedure Act rather than by the § 101 procedures. In addition to those standards which explicitly incorpo-

rate subsequent determinations to be made by the Secretary, numerous others have been rendered more comprehensible and specific by regulations defining more precisely the requirements already set forth.[29] These latter regulations have likewise been promulgated without application of the § 101 procedures.[30]

A strict literal reading of the statute's definition provision would render all of the above regulations merely advisory, without enforceable weight. Many of the interim standards would be left without enforceable essential components, which were left by the statute itself to future determination by the Secretary. Numerous others would be rendered vague and uncertain by virtue of the holding that their interpretive regulations could not be enforced.

On the whole, it appears to us that this result would greatly impair the statute's effectiveness as a tool for bringing about improvements in mine health and safety conditions. Congress could hardly have intended this result. The overall remedial purposes of the Act suggest to us that its language should be given a more liberal construction in favor of the broad goals being pursued.[31] A view finding enforceable at least some of the implementing and clarifying regulations is entirely consistent with existing judicial constructions of the Act.[32] But whether the enforcement provi-

---

27. Although the requirement that such a plan be adopted is itself an interim standard by virtue of its position in Title III of the Act. *See* 30 U.S.C. §§ 802(*l*), 863(*o*) (1970).

28. *See* note 20 *supra.*

29. For example, § 303(i)(3) sets forth extraordinary safety precautions to be taken in "virgin territory." Regulation 30 C.F.R. § 75.310–1 sets forth a multi-faceted definition of "virgin territory." Also, *see, e. g.,* 30 C.F.R. §§ 75.201–1–201–3, 75.301–1–301–8, 75.500–1 (1975).

30. It appears that all regulations adopted under the Act have emerged from proceedings consonant with the APA rulemaking provisions, 5 U.S.C. § 553 (1970), as authorized by §§ 301(d) and 508, 30 U.S.C. §§ 861(d) and 957 (1970). *See* 30 C.F.R. Part 75, at 342 (1975).

31. *See Freeman Coal Co. v. IBMA,* 504 F.2d 741, 744 (7th Cir. 1974); *Youghiogheny & Ohio Coal Co. v. Morton,* 364 F.Supp. 45 (S.D.Ohio 1973) (Three Judge Court).

32. The Interior Board of Mine Operations Appeals has uniformly held enforceable the regulations promulgated under the APA, in implementation of interim and improved mandatory standards. *Leckie Smokeless Coal Co.,* 5 I.B. M.A. 65, 82 I.D. 375 (1975); *Clinchfield Coal Co.,* 2 I.B.M.A. 364, 80 I.D. 802 (1973). *See Mid-Continent Coal Co.,* 1 I.B.M.A. 250, 79 I.D. 736 (1972). The only Court of Appeals which has confronted the question of enforceability found certain regulations unenforceable because they modified rather than implemented the underlying interim standard. *United States v. Finley Coal Co.,* 493 F.2d 285 (6th Cir. 1974), *aff'g,* 345 F.Supp. 62 (E.D.Ky.1972). It is noteworthy that the district court opinion, while invalidating certain regulations, upheld the indictment as *to violations of other regulations,* where the statute explicitly called for those regulations to be promulgated by the Secretary. *Id.* at 67.

sions should also be read to include terms of ventilation plans, a peculiar species of promulgation which the operator himself adopts,[33] is a different and more difficult question.

Finding little guidance on the face of the statute or in the legislative history,[34] we must look elsewhere to resolve the issues before us. With the case law limited primarily to decisions of the Interior Board of Mine Operations Appeals,[35] we are left to make as much sense of the statute as we can, applying time-tested principles of statutory construction. While the rubrics of interpretation which appear relevant are not, themselves, entirely without ambiguous implications, we believe that they offer a principled basis for resolution of the case before us.

■ Both parties on appeal make at least implicit reference to the general proposition that a statute should not be construed in such a way as to render certain provisions superfluous or insignificant.[36] While the arguments on both sides which take this principle as their predicate are not finally dispositive of the case, they lead us to a clearer formulation of the issues, and are thus a suitable place at which to begin.

The core of Petitioner's argument is that the Board's decision upholding enforcement of a ventilation plan provision flies in the face of the rigorous § 101 procedures to be followed in the promulgation of mandatory standards.[37] The argument is that by invoking sanctions of enforcement provisions which apply, by their terms, only to mandatory standard violations, § 101 is circumvented and, to that extent, rendered nugatory. Petitioner offers us the spectre of mine inspectors run riot, ignoring the § 101

procedures and simply insisting that newly formulated standards be included in one or another of the plans each operator must adopt.[38]

■ Insofar as plan requirements, appearing nowhere among the interim or § 101 mandatory standards, are found enforceable under § 104(b) and the other coercive sections, the statute does, in a sense, offer a way around the stringent requirements attendant to mandatory standard promulgation. As we have noted, these stringent requirements were the product of legislative battle and compromise. But Congress apparently did not realize that a host of promulgations which it expected the Secretary to make would be left unenforceable under the literal language of the § 3(*1*) mandatory standard definition. Because we read the statute as placing quite narrow limits on the subject matter properly treated in ventilation plans, and because the operator has a mechanism available to assure that plans do not exceed these limits, we conclude that enforcing duly adopted ventilation plans poses no threat to the continued vitality of § 101.

■ The statute makes clear that the ventilation plan is not formulated by the Secretary, but is "adopted by the operator." [39] While the plan must also be approved by the Secretary's representative, who may on that account have some significant leverage in determining its contents, it does not follow that he has anything close to unrestrained power to impose terms. For even where the agency representative is adamant in his insistence that certain conditions be included, the operator retains the option to refuse to adopt the plan in the

---

**33.** *See* § 303(*o*), 30 U.S.C. § 863(*o*) (1970).

**34.** The ventilation plan requirement was one of numerous amendments to the Senate's enactment, adopted before passage in the House. We have found nothing in the Committee Reports or debate casting clear light on the intended enforceability of ventilation plan provisions. Most of the material pertaining to ventilation plans is excerpted in the *Appendix*, at 127–32.

**35.** *See* note 32 *supra*.

**36.** 2A *D. Sands, Sutherland Statutory Interpretation* § 46.06 (Rev.3d ed. 1973). *See United States v. Menasche*, 348 U.S. 528, 75 S.Ct. 513, 99 L.Ed. 615 (1955).

**37.** *Petitioner's Br.* at 22–24.

**38.** *Id.* at 22. See text at notes 19–20 *supra*.

**39.** § 303(*o*), 30 U.S.C. § 863(*o*) (1970).

form required. Were the statute not clear enough on its face, the IBMA's recent decision in *Bishop Coal Company*[40] establishes beyond doubt that adoption of the plan by the operator is an essential prerequisite to the enforcement of any of its terms.

The agency's recourse to such a refusal to adopt a particular plan appears to be invocation of the civil and criminal penalties of § 109, which require an opportunity for public hearing and, ultimately, appeal to the courts.[41] At such a hearing, the operator may offer argument as to why certain terms sought to be included are not proper subjects for coverage in the plan. Because we believe that the statute offers sound basis for narrowly circumscribing the subject matter of ventilation plans, we conclude that this opportunity for review is a substantial safeguard against significant circumvention of the § 101 procedures.

The language of § 303(*o*) explicitly limits the plan at issue before us to the "ventilation system and methane and dust control." While these words might be stretched to encompass requirements pertaining indirectly but not primarily to ventilation, there would also appear to be a wide range of matters which could not properly be touched upon, under any logical reading of the section. Attempted inclusion of such matters could be successfully contested by the operator in an enforcement action brought by the Secretary.

A less apparent but more significant restriction on the Secretary's power to use the ventilation plan as a vehicle for avoiding more stringent procedural requirements, arises from the plan provision's obvious purpose to deal with unique conditions peculiar to each mine. Section 303(*o*) specifically states that the plan is to be "suitable to the conditions and the mining system of the coal mine. . . ."[42] The

context of the plan requirement, amidst the other provisions of § 303, which set forth fairly specific standards pertaining to mine ventilation, further suggests that the plan idea was conceived for a quite narrow and specific purpose. It was not to be used to impose general requirements of a variety well-suited to all or nearly all coal mines, but rather to assure that there is a comprehensive scheme for realization of the statutory goals in the particular instance of each mine.

Thus an operator might contest an action seeking to compel adoption of a plan, on the ground that it contained terms relating not to the particular circumstances of his mine, but rather imposed requirements of a general nature which should more properly have been formulated as a mandatory standard, under the provisions of § 101. This would appear to render all but inconsequential the actual circumvention of § 101 resulting from the enforceability of ventilation plans. For insofar as those plans are limited to conditions and requirements made necessary by peculiar circumstances of individual mines, they will not infringe on subject matter which could have been readily dealt with in mandatory standards of universal application.

Having rejected as largely without merit Petitioner's argument that enforcement of ventilation plan provisions would impair the effectiveness of § 101 procedures concerning mandatory standards, we move now to a parallel contention raised by the Government. The Interior Department appears to argue that a decision finding the plan provisions unenforceable would render meaningless the § 303(*o*) requirement that a ventilation plan be adopted, because "an unimplemented, approved plan clearly is equivalent to no plan at all."[43] We do not agree with the implication of Respondent's state-

---

**40.** 5 I.B.M.A. 231, 82 I.D. —— (18 November 1975). *See Valley Camp Coal Co.*, 2 I.B.M.A. 176, 81 I.D. 294 (1974).

**41.** 30 U.S.C. § 819 (1970).

It is possible that the agency has other avenues of recourse as well. While the language of § 109 seems to fit most easily the context where an operator has failed to adopt a required plan, the applicability of § 104 and § 108 should also be explored further.

**42.** § 303(*o*), 30 U.S.C. § 863(*o*) (1970).

**43.** *Respondent's Br.* at 15.

ment, that an unenforceable plan is no better than no plan at all. Certainly there is value in the simple act of thinking through the ventilation problems of a particular mine, in that it might, in itself, cause an operator to take actions leading to a safer environment, even in the absence of coercive sanctions.

Certainly, too, however, a finding of unenforceability would render the statute less effectual as a tool for assuring safe operating conditions. The question we must ask is not whether plan provisions must be enforceable to have meaning, for they clearly need not; it is rather whether they must be enforceable to have as much meaning as the framers of the statute intended. We are moved by the circumstances of the Act's adoption and its manifest purposes, by the consistent interpretations of the IBMA, and by the continuing need for stringent measures to improve mine safety, to conclude that properly adopted ventilation plan provisions must be regarded as generally enforceable under the statute.

The Federal Coal Mine Health and Safety Act was enacted out of great Congressional concern to improve the conditions in which thousands of Americans must spend their work days. Along with the statute's own language [44] and the fact that it was adopted in the wake of the Farmington disaster of 1968,[45] we believe that the nature of the scheme adopted gives some indication of the urgency felt by the statute's framers, in their pursuit of great improvements in mine health and safety conditions. In order to assure the immediate imposition of stringent requirements, Congress took upon itself the task of formulating detailed interim mandatory standards, to be enforceable immediately upon the statute's enactment.[46] Recognizing also the need for conditions to improve with scientific and technological advancement they established procedures by which existing standards could be changed, but were careful to provide that the levels of protection afforded miners may not be reduced below standards operative prior to amendment.[47]

■ Applying the rubric of statutory construction which commands that ambiguous provisions should be construed with ref-

---

**44.** The statute's preamble summarizes the concerns which gave rise to the legislation:

Congress declares that—

(a) the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner;

(b) deaths and serious injuries from unsafe and unhealthful conditions and practices in the coal mines cause grief and suffering to the miners and to their families;

(c) there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines;

(d) the existence of unsafe and unhealthful conditions and practices in the Nation's coal mines is a serious impediment to the future growth of the coal mining industry and cannot be tolerated;

(e) the operators of such mines with the assistance of the miners have the primary responsibility to prevent the existence of such conditions and practices in such mines;

(f) the disruption of production and the loss of income to operators and miners as a result of coal mine accidents or occupationally caused diseases unduly impedes and burdens commerce; and

(g) it is the purpose of this chapter (1) to establish interim mandatory health and safety standards and to direct the Secretary of Health, Education, and Welfare and the Secretary of the Interior to develop and promulgate improved mandatory health or safety standards to protect the health and safety of the Nation's coal mines; (2) to require that each operator of a coal mine and every miner in such mine comply with such standards; (3) to cooperate with, and provide assistance to, the States in the development and enforcement of effective State coal mine health and safety programs; and (4) to improve and expand, in cooperation with the States and the coal mining industry, research and development and training programs aimed at preventing coal mine accidents and occupationally caused diseases in the industry.

§ 2, 30 U.S.C. § 801 (1970).

**45.** *See* note 12 and accompanying text, *supra.*

**46.** *See* note 15 *supra.*

**47.** § 101(b), 30 U.S.C. § 811(b) (1970).

erence to the statute's manifest purpose,[48] this awareness of the statute's urgent remedial goal strongly inclines us toward a conclusion of plan provision enforceability. If, as our above discussion indicates, plan provisions can be enforced without disrupting other sections of the Act, and if, as we believe, "mandatory standard" can reasonably be read to include provisions of plans whose adoption is explicitly required under an existing mandatory standard, such enforcement seems wholly appropriate.

This conclusion of enforceability also finds consistent support in the interpretations of the IBMA, the agency assigned to implement the statute. That Board, in the case now before us and elsewhere, has made clear its view that terms of plans duly adopted pursuant to the statute are enforceable as mandatory standards.[49] Under the principle that courts should give deference to an agency's construction of its own statute,[50] we believe that the IBMA's view must be given some significant weight, especially where the literal language of the statute is as unhelpful as in this case.

Finally, we would be less than candid were we not to note our awareness of the great continuing hazards which coal miners still face, more than six years after enactment of the statute. Even as this opinion is prepared, Congressional hearings are taking place to inquire into the most recent mine disaster and to consider possible amendments to the statute tightening its standards and enforcement provisions.[51] That most recent disaster at the Scotia Company mine at Oven Fork, Kentucky, killed a total of 26 mineworkers in separate explosions occurring two days apart.[52] It does not take a great deal of technical knowledge to recognize that the deadly accumulations of methane gas which brought about this tragedy were essentially a problem of mine ventilation, which might conceivably have been ameliorated by a properly formulated and adequately enforced ventilation plan.[53] This and similar occurrences which point up the life-and-death nature of mine ventilation only confirm us in our belief that Congress intended for mine ventilation plans to be enforceable.

## IV.

For the above reasons, we conclude that requirements of duly adopted ventilation plans [54] are generally enforceable under § 104(b) and the statute's other enforcement provisions which, by their literal terms, are triggered only by mandatory standard violations. Thus we affirm the ruling of the IBMA ordering withdrawal under § 104(b), for failure to comply with the plan requirement that man-doors be treated with fire retardant material.

48. 2A D. Sands, Sutherland Statutory Construction § 46.05 (Rev. 3d. ed. 1973). See Lawson v. Suwanee Fruit & Steamship Co., 336 U.S. 198, 201, 69 S.Ct. 503, 504, 93 L.Ed. 611, 614 (1949).

49. Ziegler Coal Co., 6 I.B.M.A. 30, 82 I.D. 36 (1975) (case below); Ziegler Coal Co., 5 I.B. M.A. 132, 82 I.D. —— (19 September 1975) (enforcing violations of roof control plan). See Bishop Coal Co., 5 I.B.M.A. 231, 82 I.D. —— (18 November 1975); Valley Camp Coal Co., 2 I.B. M.A. 176, 81 I.D. 294 (1974) (held no mandatory standard violation only because ventilation plan had not been adopted).

50. See, e. g., Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 383 (1969); Zemel v. Rusk, 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179, 187 (1965).

51. N.Y. Times, 25 Mar. 1976, § 1, at 11, col. 1 (Reporting hearings of the Labor Subcommittee of the Senate Labor and Public Welfare Committee).

52. N.Y. Times, 13 Mar. 1976, § 1, at 1, col. 5.

53. The Washington Post, 26 Mar. 1976, § A, at 12, col. 1, reports testimony of Senate Committee investigators that the explosions may have been caused by makeshift modifications in the mine's ventilation system.

54. While we are not presented with a problem involving any of the other types of plans which the operator is to promulgate under the statute, much of the reasoning presented here seems to us applicable in many of those instances as well. Emergency plans appear to pose something of a special case, in that to a great extent they remain unimplemented until the contingency arises.

In so ruling, we hasten to repeat our view that ventilation plans perform a limited function within the statutory scheme, and that mine operators can not be compelled to adopt a plan which transcends these limits.[55] We note also that there may possibly be cases of substantial imposition of outrageously *ultra vires* plan provisions, where a court should refuse enforcement of a plan which the operator has nominally adopted. However, we are of the view that an operator should be held to the terms of any plan, once he has freely put his name to it and thereby acknowledged that the provisions there set forth are reasonable ones. On these facts, where the operator has never disputed the reasonableness of the provision at issue,[56] we have no difficulty concluding that he should be held, without further inquiry,[57] to the terms of the plan which he adopted.

*So ordered.*

---

**55.** *See* notes 40, 41, 42 and text accompanying, *supra*.

**56.** Opinion of Administrative Law Judge, 82 I.D. 38, 44 (1974).

**57.** Since the plan provision at issue is not alleged to be unreasonable or overly burdensome, and there is no question that it has been adopted by the operator, we see no need to inquire as to whether it is the type of term which the Secretary could compel an operator to adopt. While the court has solicited material from the Interior Division of Mine Health and Safety relating to whether the fire-retar-

dant door requirement relates to unique or specific mine conditions, our decision rests in no part upon that information. We make no decision whether operators can be compelled to incorporate such a provision in future plans.

We also find it unnecessary to decide whether ventilation plans must be promulgated pursuant to the rulemaking procedures of the APA, 5 U.S.C. 553 (1970), since Petitioner nowhere argues non-compliance with those provisions as a reason for reversing the Board's decision.