## UNITED STATES *v.* NEIFERT-WHITE CO.

No. 267.   Argued January 18, 1968.—Decided March 5, 1968.

*John S. Martin, Jr.,* argued the cause for the United States.   With him on the briefs were *Solicitor General Griswold, Assistant Attorney General Weisl, John C. Eldridge* and *Robert V. Zener.*

*Patrick F. Hooks* argued the cause for respondent. With him on the brief was *Michael J. Hughes.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

This is an action by the United States to recover statutory forfeitures under the False Claims Act.[1]   The

---

[1] In relevant part, the statute provides as follows:

R. S. § 3490 (1874):

"Any person . . . who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, Title 'CRIMES,' shall forfeit and pay to the United States the sum of two thousand dollars, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act . . . ."

R. S. § 5438 (1874):

"Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States,

question is whether the Act applies to the supplying of false information in support of an application to a federal agency, the Commodity Credit Corporation (CCC), for a loan. The District Court dismissed the action on the ground that an application for a CCC loan, as distinguished from a claim for payment of an obligation owed by the Government, is not a "claim" within the meaning of the Act. The Court of Appeals for the Ninth Circuit affirmed. We granted certiorari. 389 U. S. 814 (1967).

The CCC is authorized to make loans to grain growers to finance the construction or purchase of storage facilities. § 4 (h) of the Commodity Credit Corporation Charter Act, as amended, 62 Stat. 1071, 15 U. S. C. § 714b (h). Pursuant to its authority under statute, 15 U. S. C. § 714b (d), the CCC has adopted regulations providing for the granting of loans in amounts not to exceed 80% of the actual purchase price of storage bins. A grain grower who desires to apply for a loan is required to support his application by an invoice showing the pur-

---

or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, . . . shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars."

The criminal aspect of this statutory scheme has been altered and codified in 18 U. S. C. § 287 and 18 U. S. C. § 1001; see n. 2, *infra*. The civil (forfeiture) provisions have been codified, unaltered, in 31 U. S. C. § 231, but the above-cited version of these provisions continues to be the official one. The above-quoted provisions survive only insofar as civil liability is concerned.

chase price and the amount of the down payment made by him.   23 Fed. Reg. 9687.

Since the Government's complaint was dismissed for failure to state a cause of action, the allegations of the complaint must be taken as true for present purposes. According to the complaint, respondent is a dealer in grain storage bins.   In 1959, in selling bins to 12 grain farmers, one of respondent's officers prepared invoices in which the purchase price was deliberately overstated. The purpose was fraudulently to induce the CCC to extend loans to respondent's customers in amounts exceeding 80% of the actual purchase price.   The invoices were submitted to the CCC along with the loan applications, and the agency relied on the overstated purchase price in determining the amount of loans that were subsequently made.   The United States claims the statutory forfeiture of $2,000 for each of the 12 alleged violations of the Act.

The issue in this case is narrow and precise: Does the False Claims Act reach "claims" for favorable action by the Government upon applications for loans or is it confined to "claims" for payments due and owing from the Government? [2]   It is respondent's position that the term "claims" in the Act must be read in its narrow sense to include only a demand based upon the Government's liability to the claimant.   Respondent relies upon *United States* v. *Cohn,* 270 U. S. 339 (1926), and *United States* v. *McNinch,* 356 U. S. 595 (1958), to support this narrow reading.

*Cohn* involved a criminal proceeding under an earlier version of the present False Claims Act.[3]   It concerned a

---

[2] No other issue is presented.   The statute expressly reaches persons who falsify a "receipt" "for the purpose of . . . aiding to obtain the payment or approval of [a] claim."   See n. 1, *supra.*

[3] See n. 1, *supra.*   The criminal aspect of the original False Claims Act has been carried forward in two separate criminal statutes

fraudulent application to obtain the release of merchandise which did not belong to the United States and which was being held by the customs authorities as bailee only. The case did not involve an attempt, by fraud, to cause the Government to part with its money or property, either in discharge of an obligation or in response to an application for discretionary action. The language in the Court's opinion upon which respondent relies cannot be taken as a decision upon a point which the facts of the case did not present.[4]

In *McNinch*, the Government brought suit for damages and forfeitures under the False Claims Act, in its present form, against persons who had filed fraudulent applications for home-modernization loans with a private bank which was regularly insured by the Federal Housing Administration against losses on such loans. The bank granted the loans sought by defendants, which were "routinely" insured by the FHA.    356 U. S., at 597, n. 4.

---

currently in force. Section 287 of Title 18 makes it a crime for a person to present "any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent."

Section 1001 of the same title subjects to criminal penalties "[w]hoever . . . knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry."

Respondent has been indicted under still another criminal statute, 15 U. S. C. § 714m (a), which prohibits the making of false statements for the purpose of influencing the CCC.

[4] "[I]t is clear, in the light of the entire context, that in the present statute, the provision relating to the payment or approval of a 'claim upon or against' the Government relates solely to the payment or approval of a claim for money or property to which a right is asserted against the Government, *based upon the Government's own liability to the claimant.*" 270 U. S., at 345–346. (Emphasis added.)

This Court held that since FHA "disburses no funds nor does it otherwise suffer immediate financial detriment," *id.*, at 599, the transaction was not within the ambit of the False Claims Act. The Court emphasized the distinction between contracts of insurance against loss such as those involved in *McNinch,* and transactions in which the United States pays or lends money. For purposes of the present case, we need not reconsider the validity of this distinction. It is sufficient to note that the instant case involves a false statement made with the purpose and effect of inducing the Government immediately to part with money.

The precise question presented by this case has never been considered by the Court. However, both the history and the language of the False Claims Act, as well as the thrust of our prior decisions, indicate the answer to our present inquiry. The original False Claims Act was passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War. Debates at the time suggest that the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.[5] In its present form the Act is broadly phrased to reach any person who makes or causes to be made "any claim upon or against" the United States, or who makes a false "bill, receipt, . . . claim, . . . affidavit, or deposition" for the purpose of "obtaining or aiding to obtain the payment or approval of" such a false claim. In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil.[6] See, *e. g., United States ex rel. Marcus* v. *Hess,* 317 U. S. 537 (1943).

---

[5] See Cong. Globe, 37th Cong., 3d Sess., 952–958.

[6] See n. 1, *supra.*

On the very day that this Court decided *McNinch,* it also decided three cases holding that a fraudulent application for a loan submitted to the CCC was a claim against the Government of the United States, within the meaning of the False Claims Act.[7]  The question debated in those cases was not the meaning of the word "claim," but whether the CCC, a wholly owned government corporation, was "the Government of the United States, or any department or officer thereof" within the meaning of the statute.  In the course of its opinion on this matter, the Court noted that the objective of Congress in enacting the False Claims Act "was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made" and that "[b]y any ordinary standard the language of the Act is certainly comprehensive enough to achieve this purpose."  *Rainwater* v. *United States,* 356 U. S. 590, 592 (1958).

Analogous reasoning leads us to hold today that the False Claims Act should not be given the narrow reading that respondent urges.  This remedial statute reaches beyond "claims" which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money.  We believe the term "claim," as used in the statute, is broad enough to reach the conduct alleged by the Government in its complaint.  Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings in accordance with this opinion.  *Reversed and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[7] The principal case was *Rainwater* v. *United States,* 356 U. S. 590 (1958).  Reference was made to the other two cases, *Cato Bros.* v. *United States* and *Toepleman* v. *United States,* in the course of the opinion in *McNinch.*