SNEED, Circuit Judge:
This case comes to us on Pettis’ appeal from the district court’s dismissal of his False Claims Act suit against Morrison-Knudsen and Brown & Root on the grounds that 31 U.S.C. § 232(C) deprived the court of jurisdiction because the information on which the suit was based was already in the possession of the United States at the time the suit was brought.[1] Pettis contends that this provision is inapplicable to an informer who supplied the government with the information on which the denial of jurisdiction must rest; that, even if applicable, insufficient evidence was in possession of the United States prior to suit to invoke the bar; and that, under the circumstances of this case, the district court should not have dismissed Pettis’ suit in the absence of a hearing to determine whether the bar was properly invoked.
We hold against Pettis on each of his contentions. That is, we conclude that jurisdiction is lacking even when an informer prior to bringing suit supplies the government with the information which under 31 U.S.C. § 232(C) invokes the bar. Furthermore, we hold that the district court did not err in determining that sufficient evidence was in possession of the United States prior to the suit by Pettis to deprive it of juris *670 diction and that the hearing Pettis seeks was unnecessary under the circumstances of this case.
I.
FACTS.
Pettis was employed as the resident engineer on a road construction project in Peru from 1966-1968. His employer, Brown & Root Overseas (hereinafter Overseas), a subsidiary of Brown & Root, Inc., was the general engineer on the project. Construc-tora Emkay (hereinafter Emkay), a subsidiary of Morrison-Knudsen Co., was the general contractor for the project and the United States Agency for International Development was involved in its financing.
The project ran into problems from the start. Unexpected landslides made construction difficult and required reengineer-ing of many sections of the road. Pettis’ observations of these developments led him to complain about what he considered to be irregularities. He believed that certain officials of both Overseas and Emkay were attempting to cover up some of these problems, as well as fraudulently to charge redesign and repeat construction work to the contract. He saw other practices that he also considered fraudulent. He approached both Peruvian and United States officials in 1967 to inform them of these irregularities. In December 1968 Pettis was discharged from his employment, allegedly as a result of the charges he had made. The Peruvian government, which was conducting an investigation of the project, required Pettis to remain in Peru and assist in the investigation. As a result of this investigation, the contract with Overseas and Emkay was terminated and the Peruvian government took over work on the project. A negotiated settlement of the claims made by Peru against Emkay and Overseas was finally entered into on February 19, 1974.
The Agency for International Development conducted two audits of the project, at least partially as a result of the charges made by Mr. Pettis. One audit was completed in 1969 and the other in 1970. A study of the project was also done in 1969 by an independent consulting geologist. Pettis was still dissatisfied and notified the office of United States Senator William Proxmire, at whose request the General Accounting Office conducted an investigation. A report on the project was issued by the GAO on December 2, 1971.
On December 17, 1971, Pettis filed a False Claims Act suit against Morrison-Knudsen, Brown & Root, and Overseas in the District Court for the District of Columbia. On April 24, 1972, this action was dismissed for failure to join Emkay, an indispensable party defendant. Just prior to this dismissal Pettis had filed similar False Claims Act suits in the District of Idaho against Morrison-Knudsen and Em-kay and in the Southern District of Texas against Brown & Root and Overseas. The Idaho and Texas suits were held in abeyance pending the outcome of Pettis’ appeal from the dismissal in the District of Columbia court. In January 1974 the order of dismissal was affirmed by the Court of Appeals for the District of Columbia Circuit, solely on the ground of forum non conven-iens. On August 28,1974, the Judicial Panel on Multidistrict Litigation ordered that the Texas case be transferred to the District of Idaho for consolidated pretrial proceedings.
All the defendants then moved for dismissal on the basis of the bar of 31 U.S.C. § 232(C) and supported their motion with affidavits. Pettis’ only response was a memorandum arguing that a hearing should be held on the issue. On April 10, 1975, the district court, without holding a hearing, granted the motion to dismiss for lack of jurisdiction. This appeal followed. We affirm.
We shall examine each of Pettis’ contentions in the order set forth in the introduction of this opinion.
II.
SCOPE OF THE JURISDICTIONAL BAR OF 31 U.S.C. § 232(C).
The applicable portion of 31 U.S.C. § 232(C) provides that “[t]he court shall *671 have no jurisdiction to proceed with any such suit brought under clause (B) of this section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.” Appellant asks us to read into this provision an exception applicable to situations in which the person bringing suit is the source of the information possessed by the government prior to suit.
We begin by noting that the language of 31 U.S.C. § 232(C) affords no crevice of ambiguity within which to nestle the exception Pettis seeks. It presents a face, smooth, sharp, and unyielding. Nonetheless, we must heed the Supreme Court’s recent admonition in Train v. Colorado Public Interest Research Group, 426 U.S. 1, 9-10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), to examine relevant legislative history in the search for the intent of Congress even when the statute is clear and unambiguous on its face. It is always possible that Congress did not quite mean what it said and did not quite say what it meant.
The portion of the statute at issue here was added to the False Claims Act by the extensive amendments of 1943. 57 Stat. 608. Early in 1943 the Supreme Court held, under the then existing version of the False Claims Act, which had its origin in the Act of March 2, 1863, 12 Stat. 696, c. 67, that a qui tarn or informer action could be maintained by a private person on behalf of the United States even when based solely on information acquired from an indictment. United States ex rel. Marcus v. Hess, 317 U.S. 537, 545-48, 63 S.Ct. 379, 87 L.Ed. 443 (1943). The immediate concern of Congress was to do away with these so-called “parisitical suits.” United States v. Pittman, 151 F.2d 851, 854 (5th Cir. 1945), cert. denied, 328 U.S. 843, 66 S.Ct. 1022, 90 L.Ed. 1617 (1946); United States v. Rippetoe, 178 F.2d 735, 736 (4th Cir. 1949).
The House and Senate, however, adopted different approaches for accomplishing this end. The House bill completely abolished qui tarn actions. 89 Cong.Rec. 10844 (Dec. 17, 1943). The Senate’s approach was less drastic. Qui tarn actions survived when based upon information, evidence and sources “not then in the possession of the United States, unless obtained from such person (bringing the suit) by the United States in the course of any investigation by a grand jury, Congressional Committee, or other public body, or before a United States Commissioner or other proceeding instituted or conducted by it.” 89 Cong.Rec. 10845 (Dec. 17, 1943).
Had this language survived, the exception Pettis seeks perhaps could fairly be found to have been intended by Congress. The difficulty is that it did not. The Conference Committee substituted the language which now appears in the statute for that in the Senate version. The Conference Report stated:
Jurisdiction is denied to the court to proceed with any suit brought under clause (B) or pending suit brought under section 3491 of the Revised Statutes (private suits) whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.
89 Cong.Rec. 10845 (Dec. 17, 1943).
There exists in the legislative history no explicit explanation for the Conference Committee’s action. That it compromised the differences between the Senate and House versions is clear; but why it struck the particular compromise it did remains obscure. Opponents of the compromise in the House recognized that the honest informer would be barred from bringing suit if he had turned his information over to the government prior to filing suit. Remarks of Congressman Miller of Missouri, 89 Cong. Rec. 10847 (Dec. 17, 1943). On the other hand, it was recognized that the honest informer, under another portion of 31 *672 U.S.C. § 232(C),[2] could bring suit prior to divulging his information to the United States and maintain that suit if the United States did not choose in the appropriate manner to assume the burden. It is quite likely that it was this route open to the honest informer to which reference was made in the colloquy which superficially appears to provide support for the existence of the exception Pettis seeks. That colloquy, which took place immediately prior to the adoption by the House of the Conference Report, is as follows:
MR. KEFAUVER. Boiling the thing down as much as we can, is this not about the situation? In the first place, the average, good American citizen should not have to have a pecuniary reward in order to give information about somebody defrauding the Government?
MR. HANCOCK. The gentleman is entirely correct. It is the duty of every good citizen to protect his government.
MR. KEFAUVER. In the second place, if he has information and he gives it to the Government, and the Government does not proceed in due course, provision is made here where that suit can be brought and where he can get some compensation?
MR. HANCOCK. That is correct.
MR. KEFAUVER. So this bill, then, protects the Government and it protects the corporation or contractor from being defrauded and harassed by shysters or people who might bring suit without any information or with little information; and yet if the Government does not act, there is still a protection or a means whereby they can proceed.
MR. HANCOCK. The gentleman has correctly stated the question better than I have been able to do.
89 Cong.Rec. 10849 (Dec. 17, 1943).
Most doubt concerning the intent of Congress would be eliminated had Mr. Kefauver’s second comment been as follows:
MR. KEFAUVER. In the second place, if he has information and [after bringing suit] he gives it to the Government, and the Government does not proceed in due course, provision is made here where that suit can be [maintained] and where he can get compensation.
The possibility that Mr. Kefauver, who was obviously friendly to the conference report, generalized somewhat inaccurately permits the issue to be framed as whether Mr. Ke-fauver’s second comment, read literally, should be taken to indicate the true Congressional intent or whether that intent resides in the language of the statute which, when also read literally, is in conflict therewith. We have no doubt but that under such circumstances the intent of Congress resides in the words of the statute. That is, discharge of our obligation to follow the intent of Congress requires that we assume that Congress said what it meant and meant what it said.
Further support for this approach exists in the bill’s savings clause. That clause provides that “no abatement shall be had as to a suit pending on December 23, 1943, if before such suit was filed such person had in his possession and voluntarily disclosed to the Attorney General substantial evidence and information which was not theretofore in the possession of the Department of Justice.” 31 U.S.C. § 232(C). Had Congress intended to create the exception Pettis argues for, this savings *673 provision would have been unnecessary. Suits saved by the clause would have been authorized by the statute and thus not in need of rescue. Statutes should not be construed so as to make mere surplusage of any of the provisions included therein. See Zeigler Coal Co. v. Kleppe, 175 U.S.App.D.C. 371, 379, 536 F.2d 398, 406 (1976); Klein v. Republic Steel Corp., 435 F.2d 762, 766 (3rd Cir. 1970); Rincon Band of Mission Indians v. San Diego County, 324 F.Supp. 371, 376 (S.D.Cal.1971), aff’d, 495 F.2d 1 (9th Cir.), cert. denied, 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).
Our interpretation of the statute is supported by the Third Circuit, which is the only other circuit to have decided the precise question before us. United States v. Aster, 275 F.2d 281 (3rd Cir. 1960). Appellant argues that we should not follow Aster, but rather should be guided by the liberal construction policy he asserts is required by the Supreme Court. It is true that in determining what actions are covered by the term “claim” in the False Claims Act, the Court indicated a narrow construction is inappropriate. United States v. NeifertWhite, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968) (application for a loan treated as a claim). We are not convinced, however, that the Supreme Court would have us abandon the literal interpretation of the jurisdictional bar which, as indicated, is strongly suggested by the available legislative history. It is one thing to extend the reach of the statute to provide additional protection to the United States; it is quite another to permit the bringing of a private suit after the United States, being apprised of the facts, fails to act. Public benefit is clearly served by the first; only by assuming a corrupt and enfeebled federal government would it be unmistakably served by the second. Congress in enacting the 1943 amendments did not proceed on such an assumption nor do we think we should.[3]
Of course, a different situation exists when the corruption out of which the false claim arose also serves to prevent government action, as where, for example, a corrupt public official who is a party to the fraud prevents governmental action by concealment or otherwise. Under such conditions it is highly artificial to insist that the government “possesses” the information for the purposes of invoking the jurisdictional bar. We need not, however, pass on that question here. Therefore, United States v. Rippetoe, 178 F.2d 735 (4th Cir. 1949), which refused to find the informer barred under approximately such circumstances, whatever its merits, is distinguishable from the case before us.
Pettis, finally, asserts the bar should not exist where the United States prior to receiving his information failed to warn him that his revelations would result in a loss of his 31 U.S.C. § 232(B) rights. No such duty is imposed explicitly by the False Claims Act and the legislative history suggests nothing to the contrary. Full disclosure by the government would have been an ethically proper act were we to treat the informer and the government as individuals equally subject to a common morality. Governments, even so-called paternalistic ones, must be sovereigns first arid only thereafter, if at all, followers of the golden rule. Under our Constitution obedience to the law enacted for the common good is the indispensible mark of sovereignty. Departures from the law, even if only to respond in an ethical way to an individual, sacrifice to some degree the common good as perceived by the lawmakers. For one other than a legislature to attempt to balance the gain to the individual against the loss to the group is to court the charge of usurpation. We eschew the risk.
III.
APPLICATION OF THE JURISDICTIONAL BAR.
Appellant Pettis next contends that, even if an informer exception does not ex *674 ist, in this case his suit is not “based upon evidence or information in the possession of the United States.” The district court found that “all the essential allegations of wrongdoing contained in the present complaints of the plaintiffs were made known to the Comptroller-General and investigated by his office at least several months before the plaintiffs commenced any court action.” In addition, it found that “[t]he evidence and information which plaintiffs rely on was well known to the Comptroller-General of the United States prior to the commencement of this suit.” These findings are amply supported by the record and, to the extent a legal standard is reflected therein, are not inconsistent with our understanding of the statute.
The propriety of the legal standard depends on the extent to which the information on which the suit is based must be identical to the information in the possession of the United States in order for the jurisdictional bar to be invoked. To require that the evidence and information possessed by the United States be a mirror image of that in the hands of the qui tam plaintiff would virtually eliminate the bar. On the other hand, to permit the bar to be invoked when the United States possesses only rumors while the qui tam plaintiff has evidence and information would be to permit the bar to repeal effectively much of the False Claims Act. Between these extremes lies the answer.
More precisely, the answer rests in that area where it is possible to say that the evidence and information in possession of the United States at the time the False Claims Act suit was brought was sufficient to enable it adequately to investigate the case and to make a decision whether to prosecute. Obviously to refer to an “area” rather than a “point” lacks definiteness; but prudence requires this sacrifice. Each case requires careful analysis not likely to be aided by asserting that the evidence and information sufficient to invoke the bar must be “substantial,” “essential,” or “significant.” Despite the imprecision under which we must labor, we hold that it is clear that in this case the bar was properly invoked.
IV.
THE ABSENCE OF A HEARING.
Appellant’s final argument is that the district court improperly refused to hold a hearing before deciding that the jurisdictional bar was applicable. We also reject this argument. The defendants filed a motion to dismiss for lack of jurisdiction, supported by affidavits. The plaintiff’s only response was a memorandum asking that a hearing be held; no affidavits were submitted on behalf of the plaintiff and the memorandum contained only conclusory allegations as to what documents and testimony could be produced at the hearing.
It should be noted initially that plaintiff has the burden of establishing jurisdiction if it is properly controverted by the opposing party. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); see Uniform Oil Co. v. Phillips Petroleum Co., 400 F.2d 267 (9th Cir. 1968). We do not think that the conclusory allegations made here by plaintiff’s counsel satisfy this burden. Cf. Weller v. Cromwell Oil Co., 504 F.2d 927 (6th Cir. 1974). Since the defendants’ uncontested affidavits established that the government had sufficient information regarding the alleged fraud prior to initiation of this suit, the court properly exercised its discretion not to hold an evidentiary hearing. See Cole v. Cardoza, 441 F.2d 1337 (6th Cir. 1971). While it might have been preferable for the district judge to have told appellant explicitly that he was not going to hold a hearing, and then given him another chance to produce documents or affidavits, he did not abuse his discretion in reaching his decision on the basis of the affidavits presented by the defendant in view of the appellant’s complete failure to supply anything other than conclusory allegations. Cf. Rule 43(e), Fed.R.Civ.Proc.
AFFIRMED.

. Pettis’ suit depends on 31 U.S.C. § 232(B) for its authorization which provides as follows:
(B) Except as hereinafter provided, such suit may be brought and carried on by any person, as well for himself as for the United States, the same shall be at the sole cost and charge of such person, and shall be in the name of the United States, but shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court and the United States attomey, first filed in the case, setting forth their reasons for such consent.
31 U.S.C. § 232(C) then provides:
(C) . The court shall have no jurisdiction to proceed with any such suit brought under clause (B) of this section or pending suit brought under this section whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer or employee thereof, at the time such suit was brought.

. 31 U.S.C. § 232(C) provides:
(C) Whenever any such suit shall be brought by any person under clause (B) of this section notice of the pendency of such suit shall be given to the United States by serving upon the United States attorney for the district in which such suit shall have been brought a copy of the bill of complaint and by sending, by registered mail, or by certified mail, to the Attorney General of the United States at Washington, District of Columbia, a copy of such bill together with a disclosure in writing of substantially all evidence and information in his possession material to the effective prosecution of such suit. The United States shall have sixty days, after service as above provided, within which to enter appearance in such suit. If the United States shall fail, or decline in writing to the court, during said period of sixty days to enter any such suit, such person may carry on such suit.

. We, of course, disapprove United States ex rel. Davis v. Long’s Drugs, Inc., 411 F.Supp. 1144 (S.D.Cal.1976) to the extent that it suggests that Aster was wrongfully decided and that all provisions of the False Claims Act should be liberally construed to foster claims being brought.