**UNITED STATES of America, Appellee,**

v.

**George UZZELL, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Vernon UZZELL, Appellant.**

**Nos. 84–5108, 84–5109.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 11, 1985.

Decided Jan. 9, 1986.

Frank W. Dunham, Jr. (Brian P. Gettings, Cohen, Gettings, Alper & Dunham, Arlington, Va., on brief), for appellants.

Michael G. Middleton (J. Frederick Motz, U.S. Atty., Baltimore, Md., Linda Chathem Thomsen, Asst. U.S. Atty., on brief), for appellee.

Before ERVIN and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

Two brothers, George and Vernon Uzzell, were convicted of conspiracy to file false claims with the Small Business Administration in violation of 18 U.S.C.A. § 286. They contend that their filings with the SBA were not claims within the meaning of § 286 and that there was insufficient evidence of a conspiracy.

We find no merit in either argument.

## I.

The two brothers Uzzell acquired a machine shop, Genco Tool and Engineering Co. At the same time, Vernon leased a sheet metal shop located in the same building as Genco. Later, Vernon bought the sheet metal shop and changed its name from Martec to Unifab. By 1979, Vernon's time was divided approximately equally between Genco and Unifab.

In 1977 Genco became a participant in the SBA's "8(a) program." 15 U.S.C.A. § 637(a). That program is designed to

"foster business ownership" and "promote the competitive viability" of businesses owned and operated by socially and economically disadvantaged individuals. Participating firms are entitled to special consideration in the letting of government contracts.

A participating firm may also be entitled to "advance payments" on government contracts it has obtained. *See* 13 C.F.R. § 124.1–2 (1985). Such advances are designed to provide working capital with which to perform the government contract when the firm cannot obtain the needed capital in the commercial market. *Id.* at § 124.1–2(b)(ii). It is an interest-free loan, dedicated to the contract, and lent on the assumption that the contract proceeds will be used to repay the SBA. *Id.* at §§ 124.1–2(d)(1), (a)(1).

When a participating firm obtains a government contract, it may apply to the SBA for advance funding. If the participating firm shows that it lacks the necessary capital with which to complete the contract, cannot readily obtain it and will maintain proper financial records, the SBA may approve the application. *See id.* at §§ 124.1–2(b)(1)(i)–(iii).

Once a firm has been approved for advance funding of its government contract, the regulations provide that disbursements shall be made when immediate financial need is "verified" by the SBA. *See id.* at §§ 124.1–2(c)(1)(ii)(A), (d)(3). In practice, verification is based upon the contractor's submission of invoices or cancelled checks together with a certification that the expense was incurred in connection with the performance of the government contract.

In 1978, Genco was awarded two 8(a) contracts, and advance funding for each was approved by the SBA. The SBA dedicated $175,000 for the first contract to manufacture tank parts and $660,000 to the second contract to manufacture missile parts. A number of advance funding disbursements were made by the SBA on the basis of Martec invoices purporting to be for completed work. The SBA had not been told of the close relationship between Genco and Martec. Of course, it was not disclosed that Martec had not done the work, and it seems unlikely that much of the advances went into contract performance. There was, for instance, $317,000 advanced on a Martec invoice for production of parts on the missile contract. That advance was deposited in a Martec account upon which only Vernon could draw. He then drew checks on that account, one to himself for $39,700; one to his brother George for $56,679; one to Martec itself for $8,000; one to Genco for $74,000; one to Unifab, Martec's successor, for $95,300; and checks to cash totalling $18,800, each of which was endorsed by one of the brothers.

Genco went out of business without having repaid the SBA advances.

## II.

In *United States v. Cohn*, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926), the word "claim" was given a narrow definition in the context of a criminal case. The defendant had been convicted of fraudulently inducing the Customs Service to release a shipment of Philippine cigars to him. The defendant's demand was held not to have been a "claim," because the United States was only a temporary custodian of the cigars and had no proprietary interest in them. The Court held that a claim must be an assertion of a right "against the Government, based upon the Government's own liability to the claimant." 270 U.S. at 346, 46 S.Ct. at 253.

In *United States v. Neifert-White*, 390 U.S. 228, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968), the word "claim" was given a much broader construction in the context of a civil case. In that case the United States alleged that the defendant had filed false loan applications with the Commodity Credit Corporation. A civil action brought under the False Claims Act sought to recover a statutory forfeiture. The Supreme Court held that the remedial nature of the civil action warranted a broad reading of the word "claim" to include the filing of a false

loan application. 390 U.S. at 223, 88 S.Ct. at 962.

■ The defendants contend that in the context of this criminal case we must still take our guidance from *Cohn* notwithstanding *Neifert-White*'s much more expansive reading of the word "claim." We need not resolve that question, however, for we think the submission of the advance funding request falls comfortably within the *Cohn* definition of "claim."

Once a firm has been approved as a participant in the SBA's "8(a) program" and the SBA has approved advance funding for a particular government contract, the loan application process has been completed. Specific funds are dedicated for the use of the firm in the performance of its contract. Each disbursement must be approved by the SBA and by the firm, but approval by the SBA is largely perfunctory. The SBA's approval is obtained by presenting invoices or cancelled checks with a certification that they represent work in performance of the contract. The situation is comparable to a construction loan in which a lender makes a commitment before construction begins and obligates itself to make advances based upon documentation, such as architect's certificates or invoices of contractors. Within the statutory scheme the SBA's advance funding approval is a commitment that, upon proper documentation, the advance will be disbursed. Submission of the documentation is not a request for a discretionary loan; it is a demand that the SBA fulfill its commitment.

### III.

The district court denied motions for directed verdicts of acquittal. In making those motions the defendants contended that the evidence was insufficient to show that Vernon was aware of the submission of false claims and that George could not be convicted of conspiring with himself. The predicate, however, is groundless.

■ Far from being insufficient, the showing of Vernon's participation seems overwhelming. He was an officer and part owner of Genco. He was the owner and president of Martec on whose invoices the advances to Genco were made. Checks representing the advances were deposited in a Martec account where Vernon's was the only authorized signature, and funds from that account were disbursed to himself, his brother George and their two companies.

There was more than an abundant basis for finding that Vernon was a knowing participant in the fraudulent scheme.

### IV.

■ The Uzzells were indicted and convicted of a violation of the general conspiracy section of the False Claims Act, 18 U.S.C.A. § 286, providing for maximum punishment of 10 years imprisonment. There is a specific statute proscribing the submission of a false statement for the purpose of obtaining money from the SBA which carries a maximum term of imprisonment of two years. 15 U.S.C.A. § 645(a). The Uzzells were sentenced to terms of five years' imprisonment, but four and one-half years was suspended as to each, so that the actual required sentence service was only six months.

Prosecution of the defendants under § 286 exposed them to harsher sentences than those contemplated for fraud on the SBA under § 645. Criminal conduct, however, may be violative of more than one statute, and, in the absence of constitutional considerations not present in this case, prosecution under either statute is permissible. Moreover, § 286 proscribes conspiratorial acts, and it is not unusual to find conspiracy dealt with more harshly than the underlying substantive crime. Thus, 18 U.S.C.A. § 287 provides a five-year maximum term of imprisonment for the submission of a false claim, whereas its companion § 286 provides a maximum of 10 years for conspiring to make such a claim.

We find no infirmity either in the indictment or in the sentences.

## V.

The judgments of conviction are affirmed.

AFFIRMED.