June 23, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2108

UNITED STATES OF AMERICA,
Plaintiff, Appellant,

v.

AMERICAN HEART RESEARCH FOUNDATION, INC., ET AL.,
Defendants, Appellees.

ERRATA SHEET

The opinion of this Court issued on June 18, 1993, is
amended as follows:

On page 9, line 1: insert a comma between "understanding"
and the quotation mark that immediately follows.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2108

UNITED STATES OF AMERICA,

Plaintiff, Appellant,

v.

AMERICAN HEART RESEARCH FOUNDATION, INC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Norman H. Stahl, U. S. District Judge]

Before

Cyr, Circuit Judge,

Campbell, Senior Circuit Judge,

and Boudin, Circuit Judge.

Paul D. Scott, Attorney, Department of Justice, with whom Stuart

M. Gerson, Assistant Attorney General, Jeffrey R. Howard, United

States Attorney, Douglas N. Letter, Attorney, Department of Justice,

Michael F. Hertz, Attorney, Department of Justice, and Steven D.

Altman, Attorney, Department of Justice, were on brief for appellant.

Kenneth I. Schacter with whom David M. Cohen, Richards & O'Neil,

David Jordan and Jordan & Gfroerer were on brief for appellees.

June 18, 1993

BOUDIN, Circuit Judge. In this case, involving the

underpayment of postage based on misrepresentations, the

district court ruled that the False Claims Act, 31 U.S.C.

3729, did not (prior to its amendment in 1986) apply to so-

called "reverse false claims" whereby the government is paid

less than its due. A back-up claim for unjust enrichment was

dismissed on res judicata grounds. We agree with the

district court on the interpretation of the False Claims Act

but disagree that the unjust enrichment claim was barred by

res judicata. Accordingly, we affirm in part and vacate and

remand in part.

The facts can be briefly stated. Robert Paltrow in

1983-1984 set up two corporations--American Heart Research

Foundation, Inc. ("AHRF") and American Cancer Research Funds,

Inc. ("ACRF")--purportedly to promote research to cure these

diseases. In July 1984 Paltrow submitted an application to

the United States Postal Service to obtain for ACRF a

reduced-rate mailing permit; the application represented that

ACRF was a scientific non-profit entity helping to cure

cancer.

ACRF used the permit to mail millions of letters

soliciting for funds. AHRF, without applying for its own

permit, used ACRF's permit for its own solicitations. A

direct mail organization controlled by Paltrow, North

American Communications, Inc. ("NAC"), conducted the

-2-

mailings. As a result of the special permit, the postage was

approximately one-half the usual rate for bulk third class

mail, and ACRF and AHRF paid the Postal Service about

$472,000 less than they would have without the special

permit.

In fact ACRF and AHRF were not non-profit scientific or

charitable organizations but were old-fashioned swindles,

raising money on charitable pretexts for the benefit of the

organizers. In addition to raising funds, ACRF sent out

purported scientific surveys, of no scientific value,

apparently to gull the public into taking ACRF seriously.

Needless to say, the application ACRF filed with the Postal

Service, making the necessary claim that it was a qualified

non-profit organization under the applicable regulations, was

false. AHRF's mailings were based on the fraudulently

obtained ACRF permit.

The solicitations occurred in 1984 and 1985. In spring

1986, the government filed a criminal information against

ACRF and AHRF asserting ten counts of mail fraud under 18

U.S.C. 1341; NAC and Paltrow were named in the criminal

information as participating in the scheme but were not

separately charged. The government also filed a complaint

for injunctive relief under 18 U.S.C. 1345. That section

gives the government a civil action for expedited injunctive

-3-

relief where mail fraud is occurring or is threatened. No

damage claim was asserted in this action.

In April 1986 Paltrow pleaded ACRF and AHRF guilty on

all ten counts of mail fraud in the criminal case, and he

admitted that he and NAC employed ACRF and AHRF to defraud

the public. The civil injunction action was resolved on the

same day by a consent order enjoining Paltrow and all three

entities from charitable fund-raising through the mails. A

$100,000 criminal fine was imposed on the bogus charities and

the court ordered that the funds fraudulently obtained be

turned over to legitimate charities.

In 1990, after some preliminary negotiations failed, the

government filed the present case under the False Claims Act

against Paltrow and his three entities. The suit claimed

underpayment of postage in the amount of $472,478 and

multiple damages as provided by the statute. In the

alternative, the government sought single damages on an

unjust enrichment theory. On cross-motions for summary

judgment, the district court dismissed the False Claims Act

claims on the ground that the statute did not apply, and it

dismissed the unjust enrichment claim on res judicata

grounds.

We agree with the district court's well reasoned

treatment of the False Claims Act. The statute, prior to the

-4-

1986 amendments, provided the government with a double-damage

civil action against anyone who

(1) knowingly presents . . . to . . . the [United
States] Government . . . a false or fraudulent
claim for payment or approval; [or]

(2) knowingly makes . . . a false record or
statement to get a false or fraudulent claim paid
or approved[.]

31 U.S.C. 3729(a)(1), (2). In 1986, the statute was

amended not only to provide for treble damages but also to

apply to one who knowingly uses "a false record or statement"

in order to "conceal, avoid, or decrease an obligation to pay

. . . money . . . to the Government."1 31 U.S.C.

3729(a)(7).

The current version of the False Claims Act clearly

embraces reverse false claims, such as that presented in this

case, whereby someone uses a false statement to secure

services from the government at a reduced rate. But the

government on this appeal has not pursued its contention,

rejected by the district court, that the 1986 amendment

enacting section 3729(a)(7) applies retroactively. Thus the

question is whether securing reduced rate mailing privileges

by dint of a false statement can be classed as presenting "a

1False Claims Amendments Act of 1986, Pub. L. No. 99-
562, 100 Stat. 3153 (1986), adding inter alia section

3729(a)(7) which employs the quoted language. See generally

S. Rep. No. 345, 99th Cong., 2d Sess. (1986).

-5-

false or fraudulent claim for payment or approval" or making

a false statement to get such a "claim" paid or approved.

We think the natural weight of the words, properly the

starting point for the inquiry, leans against the

government's reading. A "claim for payment or approval"

sounds to ordinary ears like a bill from an army supplier for

uniforms or some like invoice presented for payment or for

approval to permit payment. The False Claims Act was in fact

enacted in 1863 in the wake of scandal to "combat rampant

fraud in Civil War defense contracts." S. Rep. No. 345,

supra, at 8. An attempt to secure services from the

government at reduced rates may be just as fraudulent, but at

least judged by "normal usage or understanding," United

States v. McNinch, 356 U.S. 595, 598 (1958), it is not a

"claim for payment or approval" of payment.2

In McNinch, the Supreme Court held that an application

for credit insurance, requesting the Federal Housing

Administration to insure certain bank loans, was not a "claim

for payment or approval" within the meaning of the statute.

Quoting a lower court decision, the Court said that a "claim"

against the government "normally connotes a demand for money

2The original 1863 statute reinforces this point. Its
language spoke of presenting "for payment or approval . . .
any claim upon or against the Government . . . ." Act of

Mar. 2, 1863, c. 67, 12 Stat. 696. The underscored phrase
was omitted in a subsequent revision but without any intent
to alter substance. 31 U.S.C. 3729 (1982) (see explanatory

note).

-6-

or for some transfer of public property," adding that the

statute "was not designed to reach every kind of fraud

practiced on the Government." Id. at 599. If McNinch stood

alone, it would resolve our case, for a customer's

underpayment for postal services does not involve any payment

by the government or transfer of its property.

As is often the case, there is a contrapuntal theme in

the case law. United States v. Neifert-White Co., 390 U.S.

228 (1968), held that the False Claims Act did apply to a

falsified loan application made to a federal agency where,

unlike McNinch, the false statement was made "with the

purpose and effect of inducing the Government immediately to

part with money." Id. at 232. Neifert-White said broadly

that "the Act was intended to reach all types of fraud,

without qualification, that might result in financial loss to

the Government." Id. (footnote omitted). While this

language is helpful to the government in the abstract, we

read it as directed to the subject of the Court's discussion,

namely, claims, however unconventional, asking the government

immediately "to part with money." Id.3

3Not only did the Court make its broad statement
immediately after distinguishing McNinch on the ground that

it involved no payment of government money, but two
paragraphs later, in the course of summing up, the Court
repeated the point: "This remedial statute [the False Claims
Act] reaches beyond `claims' which might be legally enforced,
to all fraudulent attempts to cause the Government to pay out

sums of money." Id. at 233 (emphasis added).

-7-

Subsequent to Neifert-White, the Supreme Court quoted

with approval, albeit in a footnote, its statement in McNinch

that "claim" in the statute normally connotes "a demand for

money or for some transfer of public property." United

States v. Bornstein, 423 U.S. 303, 309 n.4 (1976). This

reiterated equating of "claim" with a demand for money or

property is fatal to the government's position here:

securing a reduced rate for mailing, even by false

statements, is not a claim for money or property. In the

federal hierarchy, a footnote in a Supreme Court opinion

normally outweighs a covey of lower court decisions. The

lower courts are, in any event, divided as to whether the

pre-1986 False Claims Act could be stretched to include

reverse false claims. Compare, e.g., United States v.

Lawson, 522 F. Supp. 746 (D.N.J. 1981), with United States v.

Douglas, 626 F. Supp. 621 (E.D. Va. 1985).

The government is correct that the Senate Report issued

when the statute was expanded in 1986 took the position that

the statute had always embraced underpayments and that the

new language merely clarified the statute. See S. Rep. No.

345, supra, at 19. We are reluctant, however, to give much

weight in construing a Civil War statute to Committee views

first expressed over 100 years later. This is especially so

when, as here, the original language of the Civil War statute

was even more favorable to the construction that we adopt

-8-

than the pared down version later adopted with no intent to

alter substance.

No doubt the effect of fraud on the government is pretty

much the same whether too much is extracted from the federal

treasury or too little paid in. That is why Congress amended

the statute in 1986. But it is one thing to construe

ambiguous language broadly in accord with a remedial purpose;

it is quite another matter to stretch language beyond "normal

usage or understanding," McNinch, 356 U.S. at 598, when the

natural reading matches the very problem that concerned

Congress at the time the statute was enacted. When the

Supreme Court has thrice affirmed that natural reading and

emphasized that a "claim" in this context refers to one for

money or property, we think that all doubts vanish as to the

course this court should follow.

We turn now to the government's alternative remedy--its

claim for single damages based on an unjust enrichment

theory--and here our views differ from those of the able

district judge. The district court held that the "claim

preclusion" branch of res judicata barred the government from

asserting an unjust enrichment claim after it secured a final

judgment in its civil injunction action involving the same

transactions. We conclude that for reasons peculiar to the

civil injunction statute, a successful action brought under

-9-

that statute does not preclude a later separate claim by the

government for monetary relief.

Claim preclusion, formerly the merger or bar aspect of

res judicata, precludes a party who has won or lost a case on

the merits from reasserting the same cause of action in a

subsequent case. In some jurisdictions, this doctrine has

been expanded so that a final judgment on the merits

extinguishes any further "rights of the plaintiff to remedies

against the [same] defendant with respect to all or any part

of the transaction, or series of connected transactions, out

of which the [earlier] action arose." Restatement (Second)

of Judgments 24 (1982). See Diversified Foods, Inc. v.

First National Bank of Boston, 985 F.2d 27, 30 (1st Cir.

1993). This broader definition, which converts old fashioned

res judicata doctrine into a kind of compulsory joinder of

related claims, was adopted by this court in Manego v.

Orleans Board of Trade, 773 F.2d 1, 5 (1st Cir. 1985), cert.

denied, 475 U.S. 1084 (1986), for cases where federal law

controls the issue.

Under ordinary circumstances, Manego and Section 24 of

the Restatement would pose a formidable obstacle to the

government's unjust enrichment claim brought after its

successful injunction action. The parties are identical in

the two actions, both actions were civil, and the injunction

action resulted in a final judgment on the merits. Finally,

-10-

the two remedies--an injunction and the disgorgement of

unjust enrichment--are premised on the same transaction or

series of transactions, and that is normally enough where the

transactions test of Manego is followed.

Res judicata is nevertheless a judge-made doctrine based

upon practical concerns: hostility to relitigation, wariness

about double recovery, and anxiety that resources will be

wasted by successive suits where one would have sufficed.

The doctrine is not to be applied where other practical

concerns outweigh the traditional ones and favor separate

actions. See, e.g., Brown v. Felsen, 442 U.S. 127 (1979).

Here, we believe that those other concerns counsel strongly

in favor of allowing the government to bring a damage action,

whatever the underlying theory, even though the government

brought and concluded a separate injunction action under 18

U.S.C. 1345.

The purpose of section 1345 is "to allow the Attorney

General to put a speedy end to a fraud scheme by seeking an

injunction in federal district court" as soon as the

requisite evidence is secured. S. Rep. No. 225, 98th Cong.,

2d Sess. 402 (1984) (emphasis added). The statute itself

directs the district court to "proceed as soon as

practicable" to a hearing and determination. 18 U.S.C.

1345(b). The legislative history shows that Congress

authorized this expedited action precisely because "the

-11-

investigation of fraudulent schemes often takes months, if

not years, before the case is ready for criminal prosecution"

and in the meantime "innocent people continue to be

victimized." S. Rep. No. 225, supra, at 402.

The same concerns that prompted Congress to adopt

section 1345 suggest that courts should not handicap and

delay injunction actions by insisting that the government

assert at the same time any civil damage claims that may

arise from the same transactions. Commonly the government

may want to secure additional facts, including the amount of

damages, before asserting such claims and may well wish to

negotiate with the defendant as to settlement once the

ongoing violation has ceased. To require that the government

resolve these matters within, and on the same time table as,

the expedited injunction action makes no sense.

The government is not automatically exempt from

limitations on claim splitting, Federation Dep't Stores v.

Moitie, 452 U.S. 394, 398 (1981), but those limitations will

not be applied where they would frustrate a specific

statutory objective. Brown, 442 U.S. at 135-36. See also

Restatement (Second) of Judgments 26(1)(d) (1982). For

this reason the government is permitted to enjoin the

continuation of an illegal merger or other violation of the

antitrust laws and then bring its own separate damage action

-12-

for any damages it may have suffered.4 In our view the same

policy permits the government to litigate an injunction

action under section 1345 to final judgment and then bring

its own damage action as a separate case.

The treatment of the unjust enrichment claim on remand

is a matter for the district court. We express no view on

whether any aspect of the government's claim may be governed

by the issue preclusion (or collateral estoppel) branch of

res judicata, nor do we address any other questions that may

be presented by that claim. The judgment of the district

court is affirmed so far as it dismissed the government's

claims under the False Claims Act, and it is vacated and

remanded as to the claim based on the unjust enrichment

theory.

It is so ordered. No costs to either side.

4See, e.g., ITT v. GT & E, 369 F. Supp. 316, 326-27

(M.D.N.C. 1973), remanded on other grounds, 527 F.2d 1162

(4th Cir. 1975); United States v. Grinnell Corp., 307 F.

Supp. 1097 (S.D.N.Y. 1969). See generally II P. Areeda & D.

Turner, Antitrust Law 323, at 109 (1978) ("[T]he equitable

suit in the public interest ought not to be delayed or
affected by the government's concern whether or not it should
seek proprietary relief as well.").

-13-