**UNITED STATES of America**

**v.**

**MARPLE COMMUNITY RECORD, INC., et al.**

**Civ. A. No. 69–1634.**

United States District Court,
E. D. Pennsylvania.

Nov. 10, 1971.

Gary Pearch, Trial Atty., U. S. Dept. of Justice, Washington, D. C., John Sutton, First Asst. U. S. Atty. and Louis C. Bechtle, U. S. Atty., Philadelphia, Pa., for plaintiff.

Patrick W. Kittredge and Cohen, Shapiro, Polisher, Shiekman, & Cohen, Philadelphia, Pa., for defendants.

## OPINION

JOHN MORGAN DAVIS, District Judge.

Presently before this Court are several motions brought by plaintiff and defendants respectively in the above captioned matter.

The background of this case is as follows. Pursuant to its application dated February 20, 1961, the Marple Community Record, Inc. (hereafter Marple) was granted on March 29, 1961 the privilege of mailing its publication of the same name by second class mail. The application, signed by defendant Walter N. Connors, indicated that the publication then had 4,764 paid subscribers. The owner of Marple was listed as defendant Ralph V. Crisanti. From April, 1961, through April, 1965, the *Marple Community Record* was published regularly and mailed at second class rates on the basis of the initial application. On May 5, 1965, the Post Office Department reviewed Marple's files and found that Marple did not have a legitimate list of subscribers to qualify for second class mail privileges as of that date. By a list which Marple furnished to the Post Office Department and by the Post Office's own records of second class mailings by Marple, it was determined that Marple owed the Government $29,355.02 for deficient postage resulting from their usage of the second class rate during the calendar years 1962 through June 10, 1965. This information along with the Post Office's supporting statistics showing paid subscribers versus actual subscribers was included in a letter to Marple from Postal Inspector B. Krautheim. In reply by a letter dated October 26, 1965, Dominic D. Jerome, Esquire, attorney for Marple, denied Marple's liability to the government and requested a hearing. To this request, Edwin A. Riley, Director of Classifications and Special Services Division, Post Office Department, in a letter dated December 20, 1970, explained that no such hearing procedure was available but that the Post Office would consider any explanations Marple might wish to furnish. After this, at various times during 1966, 1967, and 1968, negotiations were carried on between plaintiff and Marple with respect to the alleged deficiency. No agreements were reached, however, and nothing was settled. During that time, i. e. on December 9, 1966, Mr. Riley wrote a letter informing Marple that "it was no longer entitled to second class mail privileges." This letter was followed by another from Mr. Riley, dated February 9, 1967, advising Marple that it must submit information demonstrating compliance with § 132.227, Postal Manual (percent of paid subscribers to total circulation) within thirty days on penalty of having its second class mail privileges revoked. Marple requested and received two extensions but its request for a third and longer extension in order to attract new subscribers to bring Marple into compliance with postal regulations was not acted upon. In April, 1967, plaintiff revoked Marple's second class mail privileges and Marple did not attempt to contest this decision. Consequently, this action was commenced on July 16, 1969. Count I of the action is brought under 31 U.S.C. §§ 231–235, the False Claims Act. Count II is a civil claim for fraud and deceit.

The following motions are now ripe for determination, a full hearing having been held on July 8, 1971.

a. Plaintiff's Motion for Summary Judgment with respect to Count I.

b. Defendants' Cross-Motion for Summary Judgment with respect to Count I on the ground that it fails to state a cause of action under 31 U.S.C. §§ 231–235.

c. Motion of defendants, Walter N. Connors, Ralph V. Cristani, and Edward H. De Vita, for Summary Judgment.

d. Motion of defendant E. Dudley James for Summary Judgment on Count I.

e. Plaintiff's Motions to Strike Motions in c and d above.

f. Defendants' Motion for Summary Judgment with respect to Count I on the ground that the Statute of Limitations has run.

### I.

For reasons which shall become apparent, we shall consider the Motions and Cross-Motion for Summary Judgment on Count I together, concentrating first on defendant's Cross-Motion.

■ As we have noted, Count I of the Complaint is brought pursuant to the False Claims Act, Title 31 U.S.C. § 231–235. At issue in defendant's motion is the scope of this act as defined in Title 31 U.S.C. § 231, to wit:

Any person * * * who shall * * * cause to be presented, for payment or approval * * * any claim upon or against the * * * United States * * *, knowing such claim to be * * * fraudulent, or who, for the purpose of obtaining * * * the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement of entry, * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the

amount of damages which the United States may have sustained * * *.

The defendants contend that this Act is inapposite to the present controversy, arguing that they made no "claim," as the word is used in the act, against the government when they applied for and sent the newspapers by second class postage. The historic purpose of the act and the meaning of the word "claim" as used in the context of act compels our agreement with defendant's position.

Congress' intent in adopting the False Claims Act during the Civil War was reviewed and succinctly summed up in United States v. McNinch, 356 U.S. 595, at p. 599, 78 S.Ct. 950, at p. 953, 2 L. Ed.2d 1001 (1957) wherein the Court stated:

The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before the Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop this plundering of the public treasury.

To catch the flavor of contemporary thinking as to the objective of the act, the Court in *McNinch* set forth a passage from a speech made by the manager of the bill when it was introduced into Congress:

I will simply say to the Senate that this bill has been prepared at the urgent solicitation of the officers who are connected with the administration of the War Department and Treasury Department. The country, as we know, has been full of complaints respecting the frauds and corruptions practiced in *obtaining pay from the Government* during the present war; and it is said, and earnestly urged upon our attention, that further legislation is pressingly necessary to prevent *this great evil*; and I suppose there can be no doubt that these com-

plaints are, in the main, well founded. From the attention I have been able to give the subject, I am satisfied that more stringent provisions are required for the purpose of punishing and preventing *these frauds*; and with a view to apply a more speedy and vigorous remedy *in cases of this kind* the present bill has been prepared. (Emphasis added.) Cong. Globe, 37th Cong., 3d Sess. 952.

United States v. McNinch, *supra*, at p. 559, n. 9, 78 S.Ct. at p. 953. See also United States ex rel. Marcus et al. v. Hess et al., 127 F.2d 233 (3rd Cir. 1942).

■ This congressional intent which gave birth to the act leads us as it has other courts have to conclude initially "that the False Claims Act was not designed to reach every kind of fraud practiced on the Government." United States v. McNinch, *supra*, 356 U.S. at p. 595, 78 S.Ct. at p. 953. See also United States v. Howell, 318 F.2d 162 (9th Cir. 1963). Rather as is evident, Congress designed the act to be applicable to. the particular kind of cheating that was then inhibiting the war effort, namely the practice of certain private persons in fraudulently overcharging the government for goods supplied and services rendered and because the purpose of the act was limited to deterring one kind of cheating, the writers in drafting it "used language descriptive of this kind of cheating." United States v. Tieger, 234 F.2d 589, at p. 591 n. 6 (3rd Cir. 1956). Over the years, the Courts have remained remarkably faithful to Congress' intent as expressed in the act and have refrained from applying it to all dealings between the government and private persons in which fraud was present.

■ The phrase "claim against the government normally connotes a demand for money or for some transfer of public property." United States v. Tieger, *supra*, at p. 591. That this connotation is proper when considering the scope of the act can be verified by noting that a " 'claim' must be presented for 'payment or approval'. This describes the usual procedure in making a demand for money or property." United States v. Tieger, *supra*, at p. 591, n. 7. In United States v. Cohn, 270 U.S. 339, 46 S.Ct. 251, 70 L.Ed. 616 (1926), the Supreme Court had to determine whether the conduct of the defendant amounted to "obtaining the approval of a 'claim upon or against' the Government within the meaning of the Statute [False Claims Act]." The Court in construing the key language of the act said at pp. 345–346, 46 S.Ct. at p. 252:

While the word "claim" may sometimes be used in the broad juridical sense of "a demand of some matter as of right, made by one person upon another, to do or to forbear to do some act or thing as a matter of duty," Prigg v. Commonwealth of Pennsylvania, 16 Pet. 539, 615, 10 L.Ed. 1060, it is clear in the light of the entire context, that in the present statute, the provision relating to the payment or approval of a "claim upon or against" the Government relates solely to the payment or approval of a claim for money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant.

Dictum in the recent Supreme Court case of United States v. Neifert-White Co., 390 U.S. 228, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1967) confirms the present validity of the interpretation made in Cohn. In referring to the Act, the Court concluded that "this remedial statute reaches * * * to all fraudulent attempts to cause the Government to pay out sums of money." United States v. Neifert-White, *supra*, at p. 233, 88 S.Ct. at p. 962.

■■ In the situation before us, the defendants established the right to send mail at a second class rate. Involved in securing this right was fraud, perhaps, but if so, fraud of a type distinct from that contemplated by the False Claims Act. Plaintiff alleges that the defendants were saving themselves money by

fraudulently reducing their rightful obligation to the Post Office but it does not allege that the defendants were attempting to extract from the United States money or property not rightfully due to them, a concept which appears to be at the heart of the act. Here the obligation for payment was owed by the defendants and the claim for money or property was held by the United States. Clearly, history and semantics indicate that fraud associated with an obligation owed by an individual to the government does not fall within the purview of the act. To hold otherwise would unduly distort and aggrandize the determined intent of the act. The present case is akin to United States v. Howell, 318 F. 2d 162 (9th Cir. 1963) which was an action brought by the United States against concessionaires who, being under contract to operate cleaning facilities on military bases, understated their gross receipts, a certain percentage of which were to be paid to Exchange Service. The Court in finding the False Claims Act inapposite stated at pp. 165–166:

> The United States argues that the difference between a situation where the claimant is fraudulently demanding money and one where he is fraudulently seeking a reduction in the amount of money to be paid by him is not one which warrants a different result under the False Claims Act. The effect of both types of conduct is the same in that the Government is defrauded of money to which it is entitled. This reasoning would be valid if we were dealing with a general fraud statute. But the manner in which the fraud occurs is controlling in bringing the False Claims Act into play. To do that, there must be more than mere fraud; the fraud must be predicated on a claim. The fraudulent reduction of appellees' liability to the Government does not spell out a false claim as defined by the statute.

We have read with interest and carefully considered United States ex rel. Rodriguez v. Weekly Publications, Inc., 68 F.Supp. 767 (S.D.N.Y.1946) cited by the plaintiff. Although its factual situation corresponds with that of the present case, we cannot agree with its conclusion that the right to a lower postage rate can be considered a claim against the government, let alone one for money or property.

We find therefore that since the defendants' use of a second class postage rate did not constitute a "claim" against the government, the False Claims Act is inapplicable to the fraud plaintiff contends was perpetrated upon it. Accordingly we shall grant defendant's Cross-Motion for Summary Judgment on Count I. At the same time it becomes obvious that we must dismiss the plaintiff's Motion on the same Count. Moreover, our decision on this Motion renders moot defendants' Motion for Summary Judgment on Count I on the grounds that the Statute of Limitations has run. It will be dismissed without prejudice.

## II.

We turn next to the Motion of defendants Connors, Cristani, and De Vita for Summary Judgment on the grounds that they were never properly served with a Summons and Complaint.

Plaintiff argues preliminarily that the defendants have waived this defense by failing to timely raise it. A brief review of events leading to the raising of this defense will indicate that this objection is without substance. The present action was filed on July 16, 1969 and upon defendants' failure to answer or otherwise respond, a default judgment was entered on November 21, 1969. On December 11, 1969, the defendants filed a Motion to Set Aside the Judgment by Default which was granted on December 19, 1969 by Judge Joseph S. Lord, III. In that Order defendants were allowed thirty (30) days in which to file an Answer to the Complaint. Thereupon on January 16, 1970, the defendants did file an Answer which included a challenge to the validity of the service of process.

To clear up any misconceptions on the part of the plaintiff, it

should be made clear that it was not necessary for defendants to object to jurisdiction and service of process by a special motion prior to their Answer. Rule 12 allows the responsive pleading to include as here such contradictory elements as jurisdictional defenses and counterclaims. Neifeld v. Steinberg, 438 F.2d 423 (3rd Cir. 1971). As Judge Biggs pointed out in Neifeld, at p. 428, "the Rule implicitly authorize[d] a defendant to join these [jurisdictional] defenses with a counterclaim without waiving these defenses." Clearly, the defense was raised in a timely manner since the Order that lifted the default judgment allowed the defendant thirty days in which to answer. The defense, having been properly and reasonably raised, was ripe for an application to have it determined pursuant to Rule 12(d). We should note that since the defense of improper service involves a matter in abatement and does not go to the merits of the action, the present application is improperly brought by a motion for summary judgment under Rule 56 F.R.Civ.Pro. See Moore's Federal Practice (2d Ed.) Vol. 6, Sec. 56.03. However, since this defense was timely raised in defendant's answer pursuant to Rule 12(b) and is properly before us, we shall deem defendants' Motion as an application for dismissal under Rule 12(d) F.R.Civ.Pro. and consider it now.

On August 26, 1969, the United States Marshal purported to effect service on the defendants who raise this defense by serving Walter C. Re David, Esquire, as their attorney, at his office. This was done pursuant to Rule 4 F.R.Civ.Pro. which provides:

(d) Summons: Personal Service. * * * Service shall be made as follows:

(1) Upon an individual * * * by delivering a copy of the summons and the complaint to him personally or by leaving copies thereof at his dwelling house or usual place of abode * * * or by delivering a copy of the summons and of the complaint to

an agent authorized by appointment or by law to receive service of process. Defendants contend simply that Re David was neither their attorney nor, and more importantly, authorized by any of them to accept service of process for them. In support of their position, they have submitted an affidavit signed by Re David in which he states that he was never authorized to receive process for them, that he told this to the Marshal, and that he was not at the time of service and is not now their attorney.

For service of process to be valid upon an agent, it must be shown that he was actually appointed by the defendant for the specific purpose of receiving process. Szabo v. Keeshin Motor Express Co., 10 F.R.D. 275 (N.D.Ohio 1950). See also Moore's Federal Practice (2d Ed.) Vol. 2, Sec. 4.12. Even had Re David been the defendants' attorney, as the plaintiffs claim, he would not have been the appropriate person upon whom to effect service, unless he was also specifically appointed for the purpose of receiving service. Schultz v. Schultz, 436 F.2d 635 (7th Cir. 1971). "But only where an attorney is expressly or impliedly authorized to accept service of process can his doing so bind his client and subject him to jurisdiction of the local court." Christensson v. Hogdal, 91 U.S.App.D.C. 251, 199 F.2d 402 (1952).

Plaintiff's position is that the totality of the circumstances implies that defendants did actually authorize Re David to accept service. It presents an affidavit, signed by James Kelley, who served the process upon Re David, in which he states that Re David did not refuse process and in fact, did accept it. In Schwarz v. Thomas, 98 U.S.App.D.C. 365, 222 F.2d 305 (1955) service of process was accepted by the defendant's attorney. The Court in quashing the service said, "The rule is clear that it must appear that any agent who accepts service must be shown to have been authorized to bind his principal by acceptance of process." Referring to Moore's

Federal Practice (2d Ed.) Vol. 2, Sec. 4.12, we note the following:

> Obviously, something more than mere acceptance must be shown to demonstrate an agency relationship for this specific purpose.

This gap is not filled, moreover, by plaintiff's inference that since defendants came into Court seeking to have the Default Judgment vacated, Re David must have forwarded the Complaint and Summons to them. Perhaps Re David did forward the Summons and Complaint to the defendants. If he did so, his only motivation may have been that of courtesy or the possibility of future employment.

We do not find the implication that a special agency relationship existed between Re David and the defendants from the mere showing that Re David accepted process and that the defendants later came into Court seeking to vacate the Default Judgment. See Schwarz v. Thomas, *supra*. It is evident that plaintiff is attempting to construct an agency relationship upon a foundation of speculation. We can find nothing in the relationship between Re David and the defendants which convinces us that an agency agreement for the purposes of service existed. Cf. United States v. Balanovski, 236 F.2d 298 (CA2d 1956), cert. den. 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322.

We shall therefore dismiss the present action as to defendants Connors, Cristani, and De Vita. Likewise we shall deny plaintiff's Motion to Strike the Motion that was presented by the defendants.

### III.

The remaining motions may be disposed of quickly in light of our findings above.

Since we granted defendants Cross-Motion for Summary Judgment on Count I, the Motion of defendant Dudley James for Summary Judgment on Count I, will be dismissed without prejudice as moot. Also, plaintiff's motion to strike the motion of defendant James will be dismissed without prejudice as moot.