UNITED STATES of America and United States Postal Service, Plaintiffs,

v.

Gordon F. LAWSON, Defendant.

Civ. A. No. 80–793.

United States District Court, D. New Jersey.

Sept. 25, 1981.

Amended Order Oct. 5, 1981.

William W. Robertson, U. S. Atty. by Bette Uhrmacher, Asst. U. S. Atty., Newark, N. J., for plaintiffs.

Gordon F. Lawson, pro se.

## OPINION

BROTMAN, District Judge.

On March 21, 1980, the plaintiffs, the United States of America and the United States Postal Service, instituted this action under the False Claims Act, 31 U.S.C. § 231,[1] against the defendant Gordon F. Lawson for the recovery of money damages and forfeitures as a result of defendant's alleged false, fictitious, and fraudulent claims. Jurisdiction is predicated on 28 U.S.C. § 1345, 31 U.S.C. § 232, 39 U.S.C. §§ 401 *et seq.*, and 39 U.S.C. § 2601. Currently before the court are the plaintiffs' motion, pursuant to Fed.R.Civ.P. 56, for summary judgment as to Count I of the Complaint and the defendant's motions, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss each of the counts for failure to state a claim upon which relief can be granted.

## I. *FACTS*

On February 27, 1977, the main post office, Atlantic City, New Jersey, was robbed of stamps, in the amount of $371,788.15, cash in the amount of $25,368.00 and checks and money orders amounting to $19,230.25. In addition, certain items belonging to private persons including savings bonds, treasury notes, travelers checks and registered items amounting to $636,570.41 were also stolen from the custody of the United States Postal Service. At the time of the robbery, the defendant, Gordon F. Lawson, was the Postmaster of the main post office.

On March 4, 1977, through efforts of the Federal Bureau of Investigation, certain items stolen in the robbery were recovered. Among these items were $371,667.15 worth of stamps and $521,108.00 worth of private items. Also, the United States Postal Service was able to accomplish the replacement of $17,446.41 worth of checks and money orders by the makers where the makers could be identified by the Postal Service. As a result of the various efforts of the FBI

---

1. In pertinent part, the False Claims Act, 31 U.S.C. § 231 provides that:

    Any person ... who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil ... service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, ... shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit.

and the Postal Service, the amount of postage loss remaining after the March 4, 1977 recoveries was $121.00. None of the cash was recovered; therefore, the loss remained at $25,368.00. The amount of checks and money orders which could not be replaced amounted to $1,783.84.

Among the private items stolen from the private registers was a registry item no. 0462 containing precious jewelry and diamonds valued at $9,225.00. On March 11, 1977, Galt Plaza Auction Galleries submitted a claim, PS Form 565, Registered Mail Inquiry and Application for Indemnity, in the amount of $9,225.00 plus postage of 46¢. On July 26, 1977, this claim was paid by United States Treasury check in the amount of $9,225.46. On March 29, 1977, claim no. 0462 had been approved by the Registry Claims Clerk acting on behalf of Gordon Lawson.

In addition, stolen during the robbery was registry item no. 52267, a yellow-gold 14k charm. A PS Form 565 claim was presented to the Postal Service from Bailey, Banks and Biddle on March 11, 1977, in the amount of $135.00 plus postage of 79¢. On May 10, 1977, this claim was paid by United States Treasury check in the amount of $135.79. On March 15, 1977, this claim had been approved by the Registry Claims Clerk acting on behalf of Gordon Lawson.

On March 3, 1977, Martin A. Conroy, Jr., a United States Postal Service Postal Inspector, and Jake Vendor, a Postal Systems Examiner, met with Gordon Lawson in his office at the main post office. At this meeting, Lawson was presented with PS Form 561–A, entitled U.S. POSTAL SERVICE ACCOUNTS STATEMENT RE LOSS BY BURGLARY, THEFT, FIRE, TORNADO, OR FLOOD, for his verification of the correctness of the figures in regard to the losses resulting from the robbery. Lawson took an oath and swore that the statement, PS Form 561–A, was a true and correct statement of the financial condition at his post office, and he signed the form. Also during this meeting, Conroy asked Lawson if he were involved or had any knowledge of the robbery. Lawson indicated he was not involved and had no knowledge of the event.

Later, pursuant to an investigation of the FBI, it was learned that beginning on or about January 18, 1977, until the date of the robbery on February 27, 1977, Gordon Lawson had conspired with four others to rob the Atlantic City main post office. On May 31, 1977, Lawson was indicted with his four co-conspirators by a federal grand jury in the District of New Jersey and charged with three separate counts. The first count charged conspiracy in violation of Title 18, U.S.C. § 371; the second count, robbery of the Atlantic City Post Office in violation of Title 18 U.S.C. §§ 2114 and 2; and the third count, robbery by putting in jeopardy the life of another by use of a dangerous weapon, that is a handgun, in violation of Title 18, U.S.C. §§ 2114 and 2.

On September 27, 1977, Mr. Lawson, in the presence of his attorney, entered a guilty plea to all three counts before the Hon. John F. Gerry, Judge, United States District Court for the District of New Jersey. Mr. Lawson's guilty plea was accepted. On January 5, 1978, Judge Gerry sentenced Mr. Lawson on Count I to five years and a $5,000.00 fine; on Count II to the mandatory 25 years and on Count III, to the mandatory 25 years; all counts to run concurrently. The Judge ordered that Mr. Lawson would be eligible for parole after serving seven (7) years.

## II. DISCUSSION—COUNTS I, II, III

As noted above, plaintiffs have moved, pursuant to Fed.R.Civ.P. 56, for summary judgment as to Count I of the Complaint, while defendant has moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all counts for failure to state a claim upon which relief can be granted. In analyzing Counts I, II, and III, the court has considered matters outside the pleadings. Thus, the defendant's motions as to these three counts shall also be treated as ones for summary judgment.

Summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a summary judgment motion, "inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion. The non-movant's allegations must be taken as true and, when these assertions conflict with those of the movant, the former must receive the benefit of the doubt."

*Special Jet Services v. Federal Insurance Co.*, 643 F.2d 977, 980 (3rd Cir. 1981) (Brotman, J.) [Citations Omitted].

In a commendable effort to narrow the issues, the plaintiffs and the defendant have agreed, in their briefs, as to the relevant questions before the court. All parties have indicated that judgment on Counts I, II, and III of the Complaint turns on whether the defendant's actions in submitting form 561–A (Count I) or submitting the claims for the private register items (Counts II and III) are false claims within the meaning of the False Claims Act, 31 U.S.C. § 231.[2]

In brief,

The False Claims Act provides that the United States may recover from a person who presents a false claim or causes a false claim to be presented to it a forfeiture of $2,000 plus an amount equal to double the amount of damages that it sustains by reason of the false claim.

*United States v. Bornstein*, 423 U.S. 303, 305, 96 S.Ct. 523, 526, 46 L.Ed.2d 513 (1976). Although "[t]here is little help in the way of legislative history and there are few cases interpreting the statute's broad language," *United States v. Hibbs*, 568 F.2d 347, 350 (3rd Cir. 1978), there have been some attempts to give meaning to this stat-

ute, which was enacted during the Civil War. Courts which have endeavored to discern legislative intent have concluded generally that Congress sought to halt a particular type of wrongdoing and not to enact a general anti-fraud statute. The Supreme Court has explained that:

The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before the Congress painted a sordid picture of how the United States had been billed for non-existent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop this plundering of the public treasury. At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government.

*United States v. McNinch*, 356 U.S. 595, 599, 78 S.Ct. 950, 952–53, 2 L.Ed.2d 1001 (1958). Rather, "the chief purpose . . . was to provide for restitution to the government of money taken from it by fraud." *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551, 63 S.Ct. 379, 388, 87 L.Ed. 443 (1943). In achieving this aim, the "statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert-White*, 390 U.S. 228, 233, 88 S.Ct. 959, 962, 19 L.Ed.2d 1061 (1967). *See, e. g., United States v. Hibbs, supra* at 350; *United States v. Silver*, 384 F.Supp. 617 (E.D.N.Y.1974), *aff'd*, 515 F.2d 505 (2nd Cir. 1975).

Based on the available information on Congressional intent, case law, and statutory language, the court has determined that, under the "first clause" of the False Claims Act,[3] the Government must estab-

---

**2.** The False Claims Act, 31 U.S.C. § 231, is set out, in part, at note 1, *supra*.

**3.** Note 1, *supra*, sets forth the three clauses of the statute. The "first clause" refers to

"[a]ny person . . . who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil . . . service of the United States, any claim upon or against the Government of the United States,

lish, by clear and convincing evidence, *see United States v. Klein,* 230 F.Supp. 426, 431 (W.D.Pa.1964), aff'd, 356 F.2d 983 (3rd Cir. 1966), the following elements:

1. The defendant presented or caused to be presented, for payment or approval, to the Government of the United States a claim upon or against the United States;

2. The claim was false, fictitious, or fraudulent;

3. The defendant knew that the claim was false, fictitious, or fraudulent.

4. To recover damages, it must be shown that the United States sustained damages by reason of the false claim.

*See generally, United States v. Bornstein, supra; United States v. Neifert-White Co., supra; United States v. McNinch, supra; United States v. Hibbs, supra; United States v. Silver, supra; United States v. Klein,* 230 F.Supp. 426 (W.D.Pa.1964), aff'd, 356 F.2d 983 (3rd Cir. 1966); *United States v. Howell,* 318 F.2d 162 (9th Cir. 1963); *United States v. Veneziale,* 268 F.2d 504 (3rd Cir. 1959); *United States v. Marple Community Record, Inc.,* 335 F.Supp. 95 (E.D.Pa.1971). Our examination of the facts and allegations involved in the present case leads us to conclude that neither Count I, II nor III satisfies the first element of the False Claims Act. The following discussion sets forth our reasoning with respect to each count.

A. *CLAIM—GENERALLY*

■ The presentation of a claim against the Government for payment or approval " 'normally connotes a demand for money or for some transfer of public property.' " *United States v. McNinch, supra,* 356 U.S. at 599, 78 S.Ct. at 952, quoting *United States v. Tieger,* 234 F.2d 589, 591 (3rd Cir. 1956). *See United States v. Bornstein, supra,* 423 U.S., note 4 at 303, 96 S.Ct., note 4 at 528. Even under a somewhat broader definition, only "actions which have the purpose and effect of causing the Govern-

or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent."

Although our focus is on the first "clause" or type of violation, it should be noted there is a

ment to pay out money are clearly 'claims' within the purpose of the Act." *United States v. Silver, supra* at 620. *See United States v. Neifert-White Co., supra.* Actions which courts have found to constitute claims include submitting a loan application to a federal agency, since the application has "the purpose and effect of inducing the Government immediately to part with money," *United States v. Neifert-White, supra,* 390 U.S. at 232, 88 S.Ct. at 961; *see United States v. Klein, supra,* depositing a Treasury check or cashing a Treasury check through normal banking channels, *United States v. Silver,* 384 F.Supp. 617, 620 (E.D. N.Y.1974), aff'd, 515 F.2d 505 (2nd Cir. 1975); *United States v. Scolnick,* 219 F.Supp. 408 (D.Mass.1963), aff'd, 331 F.2d 598 (1st Cir. 1964), and submitting invoices to the Government for payment for a manufactured product. *See United States v. Bornstein, supra.*

The False Claims Act has been held not to apply where the submission merely represents that the submitting party owes less money to the Government than is actually due. In effect, the Government has the claim, and the party represents that it is not liable for paying in money. Two cases illustrate this situation. In *United States v. Marple Community Record, Inc., supra,* a newspaper filed an application with the United States Post Office Department for the privilege of mailing its publication by second class mail. Subsequently, after the publication had been mailed for over two years at second class rates, the Post Office Department discovered that the defendant newspaper had supplied false information on its application and, thus, should have been paying a higher rate. The court found the Act inapplicable even though the effects of the submission were to deprive the Post Office Department of money to which it was rightfully due and to save the defendants money. The court explained that the defendants were not:

"necessity of establishing a false or fraudulent claim within the intendment of all three clauses of the statute." *United States v. Farina,* 153 F.Supp. 819, 821 (D.N.J.1957).

... attempting to extract from the United States money or property not rightfully due to them, a concept which appears to be at the heart of the act. Here the obligation for payment was owed by the defendants and the claim for money or property was held by the United States. Clearly, history and semantics indicate that fraud associated with an obligation owed by an individual to the government does not fall within the purview of the act.

*Id.* at 100.

In *United States v. Howell, supra,* the defendant cleaners had obtained Concessionaire Agreements with the Government to provide cleaning and laundering services for Government military bases. The defendants submitted statements and records which fraudulently understated the amount of commissions owed to the Government under the terms of the agreements. The court found that the defendants' conduct did not constitute a claim since there was no "demand upon the Government for the payment of money...." *Id.* at 164. The court explained that there was a difference "between a situation where the claimant is fraudulently demanding money and one where he is fraudulently seeking a reduction in the amount of money to be paid by him." *Id.* at 165. "The fraudulent reduction of [defendants'] liability to the Government does not spell out a false claim as defined by the statute." *Id.* at 166.

### 1. *Count I*

With respect to Count I, the form in question (PS Form 561–A) was submitted by defendant Lawson in his capacity as Postmaster following the robbery of his post office. The form appears to be merely a sworn verification by Lawson of the financial condition of the post office after the robbery. There is no dispute that the information provided in the form was accurate. By itself, the form does not "have the purpose and effect of causing the Government to pay out money" and thus does not constitute a claim.

However, the Government asserts that Lawson's submitting of the form constituted a request that the Postal Service relieve him of his personal liability for the loss, resulting from the robbery, of the cash, postage stamps, and other Government-owned property.[4] As a result, Lawson enriched himself and caused the Government to bear the loss. Thus, based on this interpretation, the Government argues that a "claim" was presented.

Even accepting that the purpose of submitting Form PS 561–A was to relieve Lawson of financial liability, the court finds that such conduct does not satisfy the False Claims Act's first element of presentation of a claim. The case at bar presents a situation more akin to the *Marple Community Record* and *Howell* type of cases, where the defendant represents that he owes the Government less than is rightfully

4. The regulations of the United States Postal Service dealing with the financial accountability of Postmasters are contained in Fiscal Handbook Series F–1, Financial and Cost Controls. The Handbook indicates that a postmaster is personally liable for any losses sustained by his post office until the evidence establishes that he "faithfully and conscientiously enforced Postal Service policies, programs, regulations and procedures for management of his/her post office." Section 131. When this is established, the Postal Service relieves the postmaster of liability for the loss. *Id.*

In an affidavit submitted by the Government, Martin A. Conroy, Jr., a Postal Inspector employed by the United States Postal Service, indicated that "[t]he purpose of Mr. Lawson's submission of PS Form 561–A, was to relieve himself of his personal liability for the losses at the Main Post Office as a result of the robbery on February 27, 1977." Defendant Lawson, in a document entitled "Incorporation To Motion To Dismiss For Failure To State A Claim," states that, "[t]he full intent of the document, Form 561–A, is a requirement to adjust accounting procedures to establish an accountability level with which to conduct daily accounting procedures." This statement does not contradict the Conroy affidavit, and defendant has not submitted any evidentiary sources, as required by Fed.R.Civ.P. 56(a), which dispute Conroy's statement.

On May 16, 1977, Lawson was relieved of accountability for the cash and postage stock losses. However, that relief was revoked on June 7, 1977, after the Regional Director of the Postal Service, Joseph J. Lacey, learned of Lawson's involvement in the robbery.

due, than the *Neifert-White, Silver,* or *Bornstein* type of cases, where presentation of an item acts as a demand for payment. Prior to submitting the form, Lawson owed an obligation to the Government. By presenting the form and requesting relief from financial liability, Lawson essentially was "seeking a reduction in the amount of money to be paid by him," *Howell, supra* at 166, and not demanding that money be paid or property be transferred.

Lawson's conduct did not have the purpose or effect of causing the Government to pay out money. The dissemination of money and property occurred at the time of the robbery. Count I of the suit really should not be characterized as an attempt to recover for losses resulting from the presentation of a false claim; rather, Count I actually is an attempt to use the False Claims Act's allowance of double damages and an amount as a forfeiture to recover from Lawson twice the amount of Government property lost from the robbery plus the $2,000.00 forfeiture amount. Although the court looks with great disfavor on Lawson's participation in the robbery, we cannot allow the Government to utilize an inappropriate cause of action to replace lost Government property as well as obtaining additional money. Thus, as to Count I, summary judgment will be granted for defendant Lawson since there are no material facts in issue, and he is entitled to judgment as a matter of law.

### 2. *Counts II and III*

■ Counts II and III concern the two private parties' submitting of Forms PS 565 to the United States Postal Service for reimbursement for private registry items lost as a result of the Post Office robbery. The items lost had been mailed via the registered mail procedure. Lawson, in his capacity as Postmaster, had approved the claims prior to their being paid. The plaintiffs contend that defendant Lawson's approvals of the claims for the two private register items were submissions of false claims within the meaning of 31 U.S.C. § 231. Although the conduct asserted in Counts II and III provides a somewhat harder question than that of Count I because the Government did disburse funds, the court does conclude that the defendant's actions do not satisfy the first requirement of his presenting or causing the presentation to the Government of a claim.

Through its system of mail registration, the United States has agreed to be liable, with certain conditions, to the owners of lost or damaged registered articles. *See Baumgold Brothers, Inc. v. Allan M. Fox Company, East,* 375 F.Supp. 807, 816 (N.D. Ohio 1968). *Cf. Ridgway Hatcheries, Inc. v. United States,* 278 F.Supp. 441 (N.D.Ohio 1968). In response to an inquiry from this court, the Government, in a letter dated May 20, 1981, confirmed that the United States Postal Service is primarily liable to individuals who place private pieces of property into the registered mail system. After the United States Postal Service has paid for any losses, it then looks to the Postmaster for reimbursement for those losses that were the result of his negligence or lack of reasonable care. Under this framework, the Postal Service became obligated to pay out funds to the owners of private registers when the items were stolen in the robbery. In essence, the action which precipitated the pay out occurred prior to the filing of Form PS 565, which was really a formality by which the Postal Service more readily could determine the recipients and the amounts of the payouts.

Even if the focus is on the circumstances surrounding the submission of the forms, the defendant actually was not the individual responsible for the presentation. Rather, the presentation was made by the private parties, Bailey, Banks, and Biddle and Galt Plaza Auction Gallery, whose items of registered mail had been lost, when they submitted their claims. Although Lawson, in his capacity as Postmaster, approved the claim and passed it along, he essentially acted as a conduit for a claim which had already been presented to the Government for payment. A different result might be mandated if the Postmaster were primarily liable to the parties for their losses, and he submitted the forms for reimbursement. However, that situation is not the case here.

Finally, even assuming the defendant's actions satisfied the first element of The False Claims Act, the court finds that the second requirement was not met. The "claims" were not false, fictitious, or fraudulent. It has been noted that, "[f]raud implies a misrepresentation of a material fact either expressed or implied." *United States v. Klein, supra* at 432. *See United States v. Silver, supra* at 620; *United States v. Farina,* 153 F.Supp. 819, 822 (D.N. J.1957). At no time in connection with the

submission of these "claims" did Lawson make any false, fictitious, or fraudulent representations of any material facts. There is no dispute that the information supplied by Lawson on the Forms PS 565 was correct.

In addition, the owners of the private registers were entitled to be reimbursed by the Postal Service, and, thus, it was appropriate for Lawson as Postmaster to approve the claims for their losses. Even if Lawson, because of his knowledge of and participation in the robbery, was ultimately responsible for reimbursing the Postal Service for its payout, he was not obligated to pay directly the owners of the lost items. The Government would still be required to reimburse these parties even if they knew of Lawson's participation.

### III. *DISCUSSION—COUNTS IV, V, VI*

■ Defendant Lawson also has moved, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss Counts IV, V, and VI for failure to state a claim upon which relief can be granted. An examination of these counts reveals that each one adopts by reference all of the allegations contained in the first three counts. In making his motions to dismiss as to the last three counts, the defendant relies on the inapplicability of the new allegations[5] in each count to a cause of action under the False Claims Act. Because of our decision to order summary judgment for the defendant as to the first three counts, the plaintiffs' reliance on some of the allegations in these counts to support Counts IV, V, and VI may not be warranted. As the last three counts stand now, they are ambiguous. Thus, the court has decided to grant the plaintiffs an opportunity to amend their complaint in order to clarify the causes of action under each count. The court believes such a decision is appropriate because of the current liberal rules of federal practice. *See generally United States v. Howell, supra* at 166. Of course, the defendant will be allowed to make a new motion to dismiss with respect to the amended complaint.

An order encompassing each of the court's decisions shall be entered.

### AMENDED ORDER

This matter having been brought before the court on the 3rd day of April, 1981; and

The court having considered the affidavits, briefs, pleadings and exhibits; and

For the reasons stated in the court's opinion filed September 25, 1981,

It is on this 5th day of October, 1981, hereby ORDERED that, pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure, summary judgment as to Counts I, II, and *III* of the Complaint is granted in favor of defendant, Gordon F. Lawson.

It is FURTHER ORDERED that defendant Lawson's motions, pursuant to Rule 12(b)(6), to dismiss Counts IV, V, and VI are denied and plaintiffs are granted leave to amend their complaint as to these counts within twenty-one (21) days of this order.

---

**5.** Counts IV, V, and VI assert, respectively, an unlawful conflict of interest, a betrayal of the public trust and a breach of a fiduciary obligation to the public, and an unjust enrichment.